IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

NATIONAL CREDIT UNION
ADMINISTRATION BOARD,  As
Liquidating Agent of St. Francis Credit Union,

Plaintiff,

v.

CUMIS INSURANCE SOCIETY, INC.,

Defendant.

Civil No. 16-cv-00139 DWF/LIB

**DECLARATION OF JAMES F. BALDWIN
IN SUPPORT OF OPPOSITION TO
PLAINTIFF'S MOTION TO COMPEL**

STATE OF MINNESOTA    )
                      ) ss
COUNTY OF HENNEPIN    )

James F. Baldwin, first being duly sworn on oath, states as follows:

1.      I am a shareholder with the law firm of Moss & Barnett, A Professional
Association, and one of the attorneys who represents Plaintiff National Credit Union
Administration Board in the above-referenced matter.

2.      Attached hereto as Exhibit A is a true and correct copies of pages 39-41, 66-67,
75 and 112-113 of the June 28, 2017 deposition transcript of Robert D. Roach, Senior Trial
Lawyer for the National Credit Union Administration.

3.      Attached hereto as Exhibit B is a true and correct copy of *Sleep Science
Partners, Inc. v. Avery Lieberman, et al.*, No. C 09-4200, 2010 WL 4316687

4.      Attached hereto as Exhibit C is a true and correct copy of *Murata Mfg. Co.,
Ltd. v. Bel Fuse, Inc.*, No. 3 C 2934, 2007 WL 781252.

5.      Attached hereto as Exhibit D is a true and correct copy of *PETCO Animal
Supplies Stores, Inc. v. Insurance Co. of N. Am*, No. 10-682 (SRN/JSM) 2011 WL 2490298.

I declare under penalty of perjury that everything I have stated in this document is true and correct.

Dated:  August 17, 2017    Executed in Hennepin County, Minnesota


         s/James F. Baldwin
         James F. Baldwin

3772809v1

# EXHIBIT A

 1              MR. NEALON:  Sure.

 2              (Brief discussion held off the record.

 3         Q.   (BY MR. NEALON) All right.  So Exhibit No. 4

 4    is consistent --

 5         A.   Uh-huh.

 6         Q.   -- with your earlier testimony that you

 7    forwarded this information on to Ms. -- Ms. Murphy and

 8    it turns out also to Ms. Martin, correct?

 9         A.   Yes.

10         Q.   Okay.  So on the day that you got the phone

11    call from Mr. Leake, you told mister -- get the names

12    right -- you told Mr. Barton, you told Mr. Klein, you

13    told Mr. Ianno, you told Ms. Murphy, and you told

14    Ms. Martin, correct?

15         A.   By email, yes.

16         Q.   And you provided each of them a copy -- I

17    don't -- of the -- of the electronic copy of CUMIS's

18    letter and a copy of the check, cor --

19         A.   Yes, I did.

20              MR. NEALON:  Okay.  Let's mark this as

21    dep --

22         Q.   (BY MR. NEALON) Well, let me just ask you

23    then, what is the next thing that happened as best you

24    remember with respect to the St. Francis matter after --

25    on or after June 10th, 2015?



1      A.    Sometime thereafter - it wasn't a long period

2  of time, but I just don't remember the exact number of

3  days, or it might have even been a couple of weeks, but

4  it -- it's one of those - I received a call from John

5  Ianno who wanted me to get involved in the St. Francis

6  case to the extent of getting -- or retaining the

7  services of an outside law firm to help with this

8  matter.

9      Q.    Okay.  And -- And you say it was -- it was not

10 a long time; it could have been as much as a couple of

11 weeks, correct?

12     A.    And I -- I went back and reviewed that and --

13 you know, and I'm trying to re -- I -- I had the date

14 written down somewhere in a legal pad or whatever and I

15 don't have it with me, but, I mean, it could have been a

16 week.  It really wasn't a very long period of time

17 when --

18     Q.    So sometime in June of 2000 --

19     A.    Yes, sir.

20     Q.    -- 15, you --

21     A.    Yes, sir.

22     Q.    -- recei -- We start with June 10th --

23     A.    Uh-huh.

24     Q.    -- is the phone call from Ray Leake --

25     A.    Uh-huh.



1        Q.    -- and we have our -- well, you've described

2    for me who you contacted --

3        A.    Uh-huh.

4        Q.    -- by email, and then some -- sometime later,

5    a few days perhaps, but in June of 2015, you got a

6    follow-up call from Ianno asking for your help in

7    retaining outside counsel.  Is --

8        A.    Yes, sir.

9        Q.    -- that a fair statement?

10       A.    Yes.

11       Q.    Okay.  And in between those two events did

12   anything happen in connection with St. Francis that

13   involved you as best you recollect?

14       A.    Not that I remember.  I mean, that -- I don't

15   want to be a broken record because at that time it just

16   wasn't my case, particularly in a -- any factual matter.

17       Q.    All right.  Do you remember whether or not you

18   received the original CUMIS letter and check at some

19   point during that period of time?

20       A.    There's some contention involved now within

21   the agency and that -- and -- and here's the reason why.

22   I may or may not have.  I clearly got a copy, and the

23   reason I -- I -- Maybe I shouldn't use the word

24   "contention," but the -- the reason I don't specific --

25   specifically remember why it's a copy or the original is



1    A.   I --

2    Q.   -- how it was received?

3    A.   I do not.

4    Q.   You're pointing as if you -- you were thinking

5    of something.

6    A.   Well, I -- You know, you're always careful to

7    answer correctly.  I didn't see a copy of this or become

8    aware of this until some date later, and it was referred

9    to by some other AMAC personnel as being confusing

10   because they had more than one check, and that's what I

11   remember, and let me go back again and reiterate that

12   although probably by this time I was involved in this

13   case but only to the extent of obtaining outside

14   counsel, I had nothing to do with the activities that

15   were taking place on behalf of the liquidating agent

16   with respect to the rescission.

17   Q.   When you say "outside counsel," just so the

18   record's clear, you're referring to present counsel,

19   Mr. Chockley, or --

20   A.   Yes, sir --

21   Q.   -- someone else --

22   A.   -- I am -- well, at that time it was another

23   member of Mr. Chockley's firm named Mary -- Mary Wolff

24   who's now deceased.

25   Q.   Okay.  All right.  So your understanding is



1    that June 22nd, 2015, that you were involved in the

2    matter -- the St. Francis matter but only to assist

3    Mr. Ianno in obtaining outside counsel, correct?

4          A.   Yes, sir.

5          Q.   Okay.  And that was Mr. Chockley's firm.

6          A.   Yes, sir.

7          Q.   And you don't know who at the agency received

8    this check.

9          A.   No, sir.

10         Q.   And you don't know how it was received by the

11   agency.

12         A.   No, sir, I do not.

13         Q.   And do you know what, if anything, was done

14   with the funds?

15         A.   Well, I can guess based on what I've said

16   earlier that if they received the check, it was stripped

17   and went -- sent to the lockbox, then it was put into by

18   the Division of Finance some accounting format, and it

19   would have been sent to probably DLMS - again, Division

20   of Liquidation and Member Services - and then I -- I

21   assume they would have commented upon it between them,

22   but I was not involved in that.

23         Q.   Okay.  Do you know if any inquiry was made of

24   CUMIS as to why a second check in the amount of $18,795

25   was sent to the agency in connection with St. Francis?



1  No. 14?

2      A.   I may have seen this during document

3  production, but I don't believe I -- I saw it anywhere

4  near October 29th, 2015.

5      Q.   Did anything occur in October of 2015 that

6  prompted the agency's concern as to the impact of

7  accepting and negotiating a CUMIS check with respect to

8  rescission of a CUMIS bond?

9      A.   At this time the agency, and -- and part of

10  what I was doing, had retained outside counsel and had

11  requested information on -- on rescission-related issues

12  because as I understood it, they -- they were intent on

13  fighting the rescission, hence the outside counsel.

14  They had gotten at least one opinion of counsel as I --

15  as I remember.  There may have been a se -- There was a

16  second one.  I just don't remember when it came in.  So,

17  you know, this may be part of that, but the -- they were

18  intent, as I re -- as I knew, on fighting the

19  rescission.

20      Q.   When you say "fighting the rescission" --

21      A.   Uh-huh.

22      Q.   -- are you speaking with respect to

23  St. Francis or some other matter?

24      A.   St. Francis.

25      Q.   Okay.  Do you know whether or not the issue of



1    give me an overview of the agency's response to the

2    June 10th, 2015 rescission letter, from that date until

3    the date that suit was filed in this matter on

4    January 21st, 2016.

5         A.    Yes.

6         Q.    Can you tell me what that response was, again,

7    in general, broad terms, without revealing any

8    privileged information.

9         A.    There was a discussion between AMAC personnel,

10   Dianne Salva, John Ianno, about the general matter of

11   rescission in this case.  Very shortly thereafter I was

12   notified by -- as I had indicated earlier, by John Ianno

13   that the liquidating agent wanted to retain outside

14   counsel regarding the rescission matter.  We then

15   engaged in the process of obtaining outside counsel.

16   Sadly, that's not as quick as it used to be.  It's a lot

17   more -- I hate to use the term, but bureaucratic, a lot

18   more administrative steps in obtaining counsel, but that

19   procedure went on.  There was then -- The counsel was

20   finally obtained.  Counsel then I think engaged in at

21   least two letters of opinion to the liquidating agent on

22   the overall matter, and then there was a decision that,

23   yeah, that they were going to go forward and sue and

24   they -- they filed.

25        Q.    In your opinion all -- and during that time



1   period that you just discussed, were any of those

2   actions consistent with the agency accepting CUMIS's

3   rescission --

4        A.   Based --

5        Q.   -- which --

6        A.   -- on conversations that I had or that I was

7   privy to, there was never any intent on the part of the

8   liquidating agent to accept the rescission.  That's why

9   they immediately went out and sought - excuse me -

10  outside counsel, and indeed the firm that they wanted to

11  hire, which is the firm that -- that ultimately ended up

12  representing the liquidating agent, was hired

13  specifically because it had expertise in the area of

14  rescission.

15             MR. CHOCKLEY:  Nothing further.

16             MR. NEALON:  I just have one or two

17  follow-up.

18             THE WITNESS:  Yes, sir.

19                  FURTHER EXAMINATION

20  BY MR. NEALON:

21       Q.   So the agency obtained at least two opinions

22  from outside counsel with respect to rescission in

23  this -- relating to the St. Francis matter; is that

24  correct?

25       A.   Yes.



# EXHIBIT B

2010 WL 4316687
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. California.

SLEEP SCIENCE PARTNERS INC., Plaintiff(s),
v.
Avery LIEBERMAN, et al., Defendant(s).

No. C09–4200 CW (BZ).
|
Oct. 26, 2010.

**Attorneys and Law Firms**

Alice A. Kelly, Chicago, IL, Heather Gwen Flick, The Flick Group, Joseph Ehrlich, Losch & Ehrlich, San Francisco, CA, for Plaintiff(s).

Gary Lawrence Franklin, Primmer Piper Eggleston & Cramer PC, Burlington, VT, Patrick Kenny Michael McCarthy, Law Offices of Patrick McCarthy, Pleasanton, CA, for Defendant(s).

**ORDER DENYING PLAINTIFF'S
MOTION TO COMPEL**

BERNARD ZIMMERMAN, United States Magistrate Judge.

**\*1** Before me is plaintiff's motion to compel (Docket No. 63). The only remaining issue is whether defendants have waived the attorney-client privilege for certain documents [1] identified in their privilege log. I find no need for a hearing. For the reasons explained below, plaintiff's motion to compel is **DENIED,** and defendants are not required to produce any of the privileged documents at issue.

Plaintiff initially argued that defendants waived the attorney-client privilege by asserting an advice of counsel defense and by sharing the communications with third-parties. According to defendants, however, they are not asserting an advice of counsel defense, and plaintiff's reply

accepts this position. Therefore, I only consider the waiver issue.

Plaintiff's waiver challenge is evaluated under the "shared burden" approach. *U.S. v. Chevron Corp.,* 1996 WL 444597 at *10–11 (N.D.Cal.1996). This means that the party asserting the privilege bears the initial burden to establish the communication is privileged. *Id.* If a party claims there has been a waiver, it bears the burden of establishing a prima facie case of waiver. *Id .* Once this occurs, the party asserting the privilege bears the ultimate burden of proving that the privilege has not been waived. *Id.*

Here, defendants complied with their initial burden requirement by showing that the documents were between defendants and their attorneys and contained legal advice about whether plaintiff's former CEO could work for defendants. To meet its prima facie burden of showing waiver, plaintiff contends that defendants had multiple conversations with their investors and plaintiff's former CEO regarding the legal implications of working with the former CEO. Motion to Compel at 8. According to the plaintiff, these conversations with third-parties constitute waiver.

Plaintiff's contention, however, does not result in defendants waiving their attorney-client privilege. Merely disclosing the fact that there were communications or that certain subjects were discussed with attorneys does not constitute waiver. *U.S. v. O'Malley,* 786 F.2d 786, 796 (7th Cir.1986); *Quiksilver, Inc. v. Kymsta Corp.,* 247 F.R.D. 579, 584 (C.D.Cal.2007). Rather, the content of the privileged communication with the attorneys must be shared for there to be waiver. *Quiksilver,* 247 F.R.D. at 584 ("There is a significant difference between indicating the fact or topic of a confidential [communication] with an attorney and revealing its content. The latter effects a waiver of the attorney-client privilege, while the former does not.") (citations omitted). Thus, for plaintiff to meet its prima facie burden it would have to show that defendants shared the actual content of the legal advice they received from their attorneys with third-parties like the investors or plaintiff's former CEO. Plaintiff has not done this. At most, plaintiff shows that defendants disclosed that they had obtained legal advice. Because there is no showing that the content of this legal advice was shared, plaintiff has not met its prima facie burden.

**\*2** Nor is plaintiff's prima facie showing not supported by any declarations or affidavits. *See* Local Rule 7–5 (factual contentions must be supported by a declaration). [2] This is particularly troubling because plaintiff argues in its reply that defendants have not satisfied their ultimate burden because they have not submitted any declarations or evidence to show that communications were not waived. Reply at 3. If I accept this argument from plaintiff—which I would have to if I was to rule in its favor—then I must also apply it to plaintiff. Plaintiff's lack of evidentiary support therefore results in plaintiff not being able to establish its prima facie burden that there was waiver. Without this prima facie showing, the ultimate burden does not shift back to defendants and they do not need to establish there was no waiver.

In its reply, plaintiff raises one new argument that was not discussed in its moving papers. Plaintiff contends that defendants' privilege log is deficient and certain documents are not privileged. While it may be that some documents are not privileged, [3] plaintiff should have raised this challenge it in its moving papers. By first raising it in its reply, plaintiffs improperly deprived defendants of the opportunity to respond. *See U.S. v. Romm,* 455 F.3d 990, 997 (9th Cir.2005) ("arguments not raised by a party in its opening brief are deemed waived"). [4]

For the foregoing reasons, plaintiff's motion to compel is **DENIED.** Both parties also seek an award of attorneys' fees incurred in this discovery dispute. These requests are improper because they do not comply with Local Rules 7–8(a) and 37–3 which require motions for sanctions to be filed separately and the expenses requested to be itemized. [5] As such, the requests for sanctions are **DENIED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 4316687

Footnotes

1    The documents plaintiff seeks are mainly communications between defendants and their attorneys regarding the legality of plaintiff's former CEO working for defendants.

2    Perhaps plaintiff did not feel it was necessary to submit a declaration in support of its allegations because the communications that allegedly constituted waiver were marked as confidential. *See* Motion to Compel at 8, fn. 1. Plaintiff, however, does not explain why a motion to seal would not have alleviated its confidentiality concerns. Moreover, even if plaintiff decided to not submit the confidential communications, plaintiff was still required to submit a declaration to support the factual allegations it was making.

3    For instance, defendants' designation of an e-mail from plaintiff's former CEO to defendants was identified as privileged even though there were no attorney senders or recipients. Declaration of Alice A. Kelly: Ex. G, Bate Stamp SW04331.

4    For the same reason, I do not consider plaintiff's submission in its reply of the investor's deposition. Reply at 3. This submission, once again made without a declaration, comes too late since plaintiff is required to make its prima facie showing in its moving papers (so that the ultimate burden may shift to defendants in the opposition). In any event, excerpts from the deposition only show that defendants obtained legal advice and not that the actual content of the legal advice was disclosed.

5    Plaintiff is also not entitled to attorneys' fees because its motion is denied.

---

**End of Document**                                             © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   2

# EXHIBIT C

2007 WL 781252
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

MURATA MANUFACTURING CO., LTD., Plaintiff,

v.

BEL FUSE, INC., et al., Defendants.

No. 03 C 2934.
|
March 8, 2007.

**Attorneys and Law Firms**

Patrick Joseph Kelleher, Richard Andrew Wulff, Drinker
Biddle Gardner Carton, Andrea Maria Augustine, Brian
C. Rupp, Michael E. Barry, Peter J. Meyer, Gardner
Carton & Douglas LLP, Chicago, IL, for Plaintiff.

Andres N. Madrid, Steinberg & Raskin P.C., Joshua
L. Raskin, Martin G. Raskin, Wolf, Block, Schorr and
Solis-Cohen LLP, New York, NY, David J. Sheikh,
Niro, Scavone, Haller & Niro, Ltd., Chicago, IL, for
Defendants.

### *MEMORANDUM OPINION AND ORDER*

JEFFREY COLE, United States Magistrate Judge.

**\*1** Murata Manufacturing Co., Ltd. ("Murata") sued
Bel Fuse Inc., Bel Fuse Ltd., Bel Stewart Ltd., and Bell
Connector Inc. (collectively "Bel Fuse") for infringement
of United States Patent No. 5,069,641 ("the #641
Patent"). Bel Fuse has asserted the defenses of non-
infringement, invalidity, and inequitable conduct before
the patent office. The basis for this last defense is Bel
Fuse's contention that the inventors of the patent-in-
suit, their attorneys and/or other individuals at Murata
substantively involved in the prosecution of the patent-
in-suit intentionally withheld a material prior art patent-
specifically, U.S. Patent No. 4,789,847 ("the #847
patent")-from the patent office during the prosecution of
the patent-in-suit with an intent to deceive.

In response to Bel Fuse's inequitable conduct defense,
Murata has claimed in depositions and answers to

interrogatories that the #847 patent was not "material"
prior art. In fact, according to Murata, it was so
immaterial to the patentability of the patent-in-suit
that the inventors and Murata's attorneys never even
considered disclosing it. Bel Fuse now seeks the
production of certain documents related to this issue that
Murata has withheld from discovery under a claim of
attorney-client privilege. Bel Fuse contends that Murata
has waived the privilege as to documents that are relevant
to Bel Fuse's inequitable conduct claim. For the following
reasons, I find that no waiver has occurred and deny Bel
Fuse's motion to compel.

Bel Fuse's argument goes this way. The documents being
withheld by Murata are communications between Murata
employees and Murata's Japanese attorneys or between
Murata's Japanese attorneys and Murata's attorneys in
the United States, and relate to the duty of disclosure to
the patent office as well as to an Information Disclosure
Statement ("IDS") the Murata inventors submitted to the
patent office during the prosecution of the patent-in-suit.
Bel Fuse submits that any privilege covering the withheld
documents was *expressly* waived by Murata during two
Rule 30(b)(6) depositions in March and October of 2006
when Murata's witness referred to the communications
and their relation to: (1) the decision to disclose certain
prior art to the PTO during prosecution of the patent-in-
suit; (2) the preparation and submission of the IDS in a
purported attempt to comply with the duty of disclosure;
(3) the inventors' purported knowledge and understanding
of the duty of disclosure; and (4) the inventors' purported
compliance with the duty of disclosure. As Bel Fuse would
have it, when Murata's witness testified as to the existence
of such privileged communications, Murata *expressly*
waived the attorney-client privilege as to these discussions
and to all other privileged communications relating to the
same subject matter.

In addition to the express waiver argument, Bel Fuse
also argues that Murata *impliedly* waived any privilege
covering the withheld documents by placing its state of
mind as to key elements of Bel Fuse's inequitable conduct
claim at issue in this case by contending that Murata
inventors, its in-house attorneys, and its outside Japanese
counsel were fully aware of their duty of disclosure under
U.S. law, that these individuals knew what "material
to the patentability of the invention" meant, and that
these individuals believed that the #847 patent was so
immaterial to the patent-in-suit that it never even occurred

to any of them to bring the #847 patent to the attention of the patent examiner. According to Bel Fuse, Murata should not be permitted to inject into the case these issues concerning its state of mind regarding key elements of Bel Fuse's claim and, at the same time, shield alleged privileged communications relating to those same topics.

## I.

### The 30(b)(6) Deposition Testimony Mr. Keating Did Not Effect A Waiver Of The Attorney-Client Privilege

**\*2** On March 5, 2004, Murata designated Joseph Keating to testify at a Rule 30(b)(6) deposition regarding "all steps taken by Murata's attorneys to comply with their duty of candor to the United States Patent and Trademark Office with respect to the prosecution of the #641 patent application." During that deposition, Mr. Keating testified that there were various communications on that subject among Murata, Murata's American counsel-Burns Doane, Swecker & Mathis, L.L.P. ("Burns Doane")-and Murata's Japanese attorney, the Morishita law firm. Mr. Keating testified that Murata's attorneys informed him that, in order to comply with the duty of candor, they took the steps reflected in the written record of the prosecution of the #641 patent application. (*Bel Fuse's Ex. 5,* Keating Dep. at 26). When Burns Doane asked what prior art to identify, "Murata instructed Burns Doane to submit an IDS the #204 patent [1] and all prior art references which were cited in the #204 patent." (*Id.* at 27). Mr. Keating said he did not believe Murata identified any other prior art. (*Id.* at 28). In addition, he testified that Murata's Japanese patent application corresponding to the #641 patent included the # 204 patent prior art references, and the "Japanese patent attorney instructed U.S. counsel that prosecuted the #641 to cite the #204 patent and all prior art references that were cited in the #204 patent." (*Id.* at 29). [2]

On October 11, 2006, Murata again produced Mr. Keating to testify on its behalf, this time regarding discussions concerning the duty of disclosure with each of the inventors of the patent-in-suit including, but not limited to, any discussions and explanations as to what constitutes "material information" as that term is used in the declaration accompanying the application for the patent-in-suit. Mr. Keating testified that, based

on conversations with a Mr. Kimura, he believed that all the inventors knew and understood the duty of disclosure; Mr. Kimura assured him of this. (*Bel Fuse Ex. 5,* 2nd Keating Dep. at 95). Mr. Kimura explained to Mr. Keating that he was sure of this based on their experience as inventors having to comply with the duty of disclosure in the past, and as a result of their periodic communications with U.S. patent attorneys. (*Id.* at 96). These communications came to the inventors by way of Murata's Japanese law firm and Mr. Kimura. (*Id.* at 106-107). The inventors were also familiar with the applicable forms-which were printed in both English and Japanese-that explained the duty of disclosure and what "material information" meant. (*Id.* at 96). Based on his discussions with Mr. Kimura, Mr. Keating was confident that the inventors believed the #847 patent was not material to the #641 patent application. (*Id.* at 108).

For Bel Fuse, these snippets of deposition testimony constitute disclosure of confidential attorney-client communications resulting in an *express* waiver of the privilege as to those communications. But the attorney-client privilege is not waived unless portions of communications that are private between attorney and client are revealed. *United States v. Buljubasic,* 808 F.2d 1260, 1268 (7th Cir.1987); *United States v. Lawless,* 709 F.2d 485, 487 (7th Cir .1983). Such a revelation waives the privilege as to the residue of the confidential communication. *Buljubasic,* 808 F.2d at 1268; *Lawless,* 709 F.2d at 487. No such revelation occurred here.

**\*3** All that Mr. Keating's testimony revealed is that Murata and its attorneys determined that the #204 patent would be disclosed in the #641 patent application, and that the inventors knew about the duty of disclosure and what constituted material information. The disclosures made in the course of prosecuting the #641 patent are not confidential, and consequently Mr. Keating's testimony regarding them does not waive the privilege. *Buljubasic,* 808 F.2d at 1268("A client does not waive the privilege by stating facts that outsiders already know or could deduce."); *Denius v. Dunlap,* 209 F.3d 944, 952 (7th Cir.2000) (communications made with the knowledge that the information would be transmitted to a third party are no longer confidential and, therefore, not protected by the privilege). Phrased differently, testimony about non-privileged communications cannot waive a privilege as to other communications that are protected by the attorney client privilege.

Similarly, Mr. Keating's testimony that he understood that the inventors knew about their duty of disclosure and understood what would constitute "material information" did not reveal any confidences. At most, Mr. Keating stated that the inventors had communications with Murata's attorneys. There is a significant difference between indicating the fact or topic of a confidential with an attorney and revealing its content. The latter effects a waiver of the attorney-client privilege, while the former does not. *See United States v. Smith,* 454 F.3d 707, 713 (7th Cir.2006) (client who revealed what his lawyer told him indicated a willingness to waive the privilege); *see Sarkes Tarzian, Inc. v. U .S. Trust Co. of Florida Sav. Bank,* 397 F.3d 577, 584 (7th Cir.2005), *cert. denied,* 546 U.S. 928, 126 S.Ct. 398, 163 L.Ed.2d 276 (2005) (responding fully to questions covered by the attorney-client privilege is an implicit waiver of that privilege).

If Bel Fuse's argument were accepted, it would mean that privilege logs, and compliance with Fed.R.Civ.P. 26(b)(5), would operate as a waiver of the attorney client privilege. Rule 26(b) (5) demands that a party asserting the privilege as to a document "shall describe the nature of the ... communications ... in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the applicability of the privilege or protection." *See also Hobley v. Burge,* 433 F.3d 946, 947 (7th Cir.2006) ("An attorney asserting privilege must timely support that claim with a "privilege log" which describes the nature of each document being withheld."). One can readily imagine Mr. Keating's testimony transcribed into the "Subject" column of a privilege log: "communication with inventors re: duty or disclosure;" "communication with inventors re: 'material information';" or "communication from counsel re: #204 patent disclosure." None of these topical descriptions in a privilege log would be held to waive the privilege, and the result cannot be different here simply because the topics were enunciated in deposition testimony in response to Bel Fuse's questioning. As such, merely adverting to the nature of a communication, as Mr. Keating did here, cannot be held to amount to a revelation of the protected information that waives the attorney-client privilege. There was no waiver of the privilege as a result of the testimony on which Bel Fuse relies. [3]

## II.

### Murata's Opposition to Bel Fuse's Charge Of Inequitable Conduct Before The Patent Offense Does Not Result In A Waiver Of Murata's Attorney-Client Privilege

**\*4** Next, Bel Fuse argues that because it has raised the issue of inequitable conduct before the patent office as an affirmative defense to Murata's charges of infringement, and Murata has denied it, Murata's attorney-client privilege is waived. Although the argument as advanced is phrased more obliquely, at bottom this is what Bel Fuse is contending. If accepted, a defendant charged with inequitable conduct would find itself between Scylla and Charybdis: it would either have to waive its attorney client privilege in order to defend itself or concede liability in order to preserve the privilege, which would become valueless. In a constitutional context, the Supreme Court has said that a defendant in a criminal case cannot be forced to choose between asserting his Fifth Amendment privilege at the price of relinquishing his rights under the Fourth Amendment. *See Simmons v. United States,* 390 U.S. 377, 393-394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The Court found it intolerable that one constitutional right should have to be surrendered in order to assert another. While the "benefit" to be given up-the attorney client privilege-is not a constitutional right, it is one that lies at the heart of our adversary system.

The attorney-client privilege is the oldest of the recognized privileges for confidential communications known to the common law. *Jaffee v. Redmond,* 518 U.S. 1, 11, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996); *Upjohn Co. v. United States* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Deeply rooted in public policy, *In re Ford Motor Co.,* 110 F.3d 954, 966 (3d Cir.1997), and playing a "vital role" in the administration of justice, *American Nat. Bank and Trust Co. of Chicago v. Equitable Life Assur. Soc. of U.S.,* 406 U.S. 867, 878, (7th Cir.2005), it remains one of the most carefully guarded privileges and is not readily to be whittled down. *See Swidler & Berlin v. United States,* 524 U.S. 399, 403, 118 S.Ct. 2081, 141 L.Ed.2d 379(1998). The privilege's central concern-and its ultimate justification-is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice. Without that frankness, sound legal advice is impossible,

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

and without informed advice, the ultimate goal of the attorney-client privilege is unattainable. *Upjohn v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). In light of the importance of the attorney client privilege, the tension the Court found intolerable in *Simmons* is no more tolerable here.

A brief discussion about the question of inequitable conduct before the patent office will provide a useful background for disposition of the present issue. The Federal Circuit has recently reiterated the issues attendant such a charge in *Cargill, Inc. v. Canbra Foods, Ltd.,* 476 F.3d 1359, 2007 WL 466248, *3 (Fed.Cir.2007): To hold a patent unenforceable due to inequitable conduct, there must be clear and convincing evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the U.S. Patent and Trademark Office ("PTO").

3

   **\*5** [I]nformation is material to patentability when it is not cumulative to information already of record or being made of record in the application, and

      (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim, or

      (2) It refutes, or is inconsistent with, a position the applicant takes in:

      (I) Opposing an argument of unpatentability relied on by the Office, or

      (ii) Asserting an argument of patentability.

A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

The intent element of inequitable conduct requires that "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a

finding of intent to deceive." Intent rarely can be, and need not be, proven by direct evidence. Instead, an intent to deceive is usually inferred from the facts and circumstances surrounding the conduct at issue.

If a district court finds that the requirements of materiality and intent have been established by clear and convincing evidence, it must then "balance the equities to determine whether the patentee has committed inequitable conduct that warrants holding the patent unenforceable." Under the balancing test, "[t]he more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct, and vice versa."

476 F.3d 1359, 2007 WL 466248, *3.

Bel Fuse grounds its contention that Murata has waived its attorney-client privilege on Murata's interrogatory responses in this case, which set forth the bases for its denial of Bel Fuse's charge of inequitable conduct. In those responses, Murata stated that, notwithstanding the fact that two of the inventors of the patent-in-suit also were inventors of the #847 patent, it did not occur to them that the #847 patent should be cited in the prosecution of the patent-in-suit, and the possibility was not even suggested to them. (*Bel Fuse's Ex. 6* at 44-45). Murata also stated that none of the attorneys or other individuals at Murata involved in the prosecution of the patent-in-suit had any knowledge of the #847 patent. (*Id.* at 45-46). This, Murata later explained, could be distinguished from a situation where a deliberate decision not to cite a piece of prior art was made. (*Id . at 52).* And, as did Mr. Keating in his deposition testimony, Murata stated that the inventors were well aware of their duty of disclosure through past experience, and a review of their disclosures in the prosecution of the #641 patent reveals references that were likely unnecessary. In other words, the inventor's citations to prior art demonstrate that they were erring on the side of caution and disclosing more than their duty required. (*Id.* at 53).

   **\*6** Perhaps more importantly, Murata set forth its position on why the # 847 patent was not material to the prosecution of the #641 patent:

      The #847 patent would not have been important to a reasonable examiner in determining whether to allow the claims of the #641 patent

to issue. Stated in more recent terms, the #847 patent, either alone or in combination, does not establish a *prima facie* case of unpatentability of any claim of the #641 patent. Nor is it inconsistent with any position taken by the applicants during prosecution.

(*Id.* at 46).

Murata then went on to elucidate its positions with comparisons between the two devices, and a history of prior art references made in prosecutions of patents for related types of devices. (*Id.* at 46-51). Based on these interrogatory responses, Bel Fuse argues that Murata has waived the attorney-client privilege by "placing the states of mind of the inventors, Murata's attorneys, and any other individuals involved in the prosecution of the patent-in-suit ...." (*Bel Fuse's Motion to Compel,* at 12). But the mere fact that one's "state of mind" becomes an issue in a case does not necessarily mean that the attorney-client privilege has been waived. It is the manner of proof involved that determines whether there has been a waiver.

There is, of course, the familiar waiver that occurs when advice of counsel is put at issue. *See Garcia v. Zenith Electronics Corp .,* 58 F.3d 1171, 1175 (7th Cir.1995). In patent cases, this most often arises when a defense of advice of counsel is lodged against a charge of willful infringement. *See In re EchoStar Communications Corp.,* 448 F.3d 1294, 1299 (Fed.Cir.2006). The defendant must reveal that advice to refute the charge and so the privilege is waived. But Bel Fuse does not assert an "advice-of-counsel" waiver here; it asserts an "at-issue" waiver, relying on *Pyramid Controls, Inc. v. Seimens Industrial Automations, Inc.,* 176 F.R.D. 269, 271 (N.D.Ill.1997). The "at issue" waiver of the attorney-client privilege is implied when a party voluntarily injects a new factual or legal issue into a case, the truthful resolution of which will require examining confidential communications. *Lorenz v. Valley Forge Insurance Co.,* 815 F.2d 1095, 1097 (7th Cir.1987); *Pyramid Controls, Inc. v. Seimens Industrial Automations, Inc.,* 176 F.R.D. 269, 271 (N.D.Ill.1997); *see also In re Lott,* 424 F.3d 446, 453 (6th Cir.2005) (waiver where "the pleading places at issue the subject matter of a privileged communication in such a way that the party holding the privilege will be forced to draw upon the privileged material at trial in order to prevail."); *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.,*

32 F.3d 851, 863 (3d Cir.1994) (cited with approval in *Garcia v. Zenith Elecs. Corp.,* 58 F.3d 1171, 1175 n. 1 (7th Cir.1995)) (waiver when the privilege holder "asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney-client communication."). Here, however, there is nothing to suggest that resolution of this issue will require examination of confidential communications.

**\*7** As detailed above, the interrogatory responses that Bel Fuse seems to characterize as "smoking guns" do not rely on the substance of confidential communications. Murata's assertions in those responses can be tested without necessary resort to examination of any such material. Instead, the interrogatory responses at issue rely heavily on the public record of the patent prosecution, a comparison of the claims of the prior art at issue, and the inventors' past experience. Clearly, a decision regarding materiality rests on no confidential information but a comparison of the prior art at issue, *Cargill, Inc.,* 476 F.3d 1359, 2007 WL 466248, *3, which is exactly what Murata suggests in its interrogatory responses. (*Bel Fuse's Ex. 6,* at 46-52). That the inventors understood their duty of disclosure is demonstrated, according to Murata, not through examination of attorney-client communications but through the inventors' filing of the IDS, their signing of sworn statements in both English and Japanese, and their prolific experience with the patent office-they had received more than 40 patents among them. (*Id.* at 52-54). Similarly, Murata contends that good faith is demonstrated through these same types of evidence, in addition to the scope of prior art the inventors did cite in connection with the prosecution of the patent-in-suit. (*Id.*). If there is a reference to the content of a confidential attorney-client communication in these responses, let alone a communication on which the resolution of this issue hinges, Bel Fuse has not pointed it out.

The two cases upon which Bel Fuse relies, *General Elec. Co. v. Hoechst Celanese Corp.,* 1990 WL 154218, *9 (D.Del.1990) and *Starsight Telecast, Inc. v. Gemstar Development Corp.,* 158 F.R.D. 650, 654 (N.D.Cal.1994) do not compel a different result. In *General Elec.,* the court was dealing with a different issue than inequitable conduct before the patent office, at least in degree: the crime-fraud exception to the attorney-client privilege. 1990 WL 154218, *5-6, 8. The plaintiff hoped to prove it was innocent of fraud on the patent office by relying on the claims of two inventors that they did not recall

a certain experiment that was relevant to the patent-in-issue. *Id.* at *8-9. In so testifying, the inventors referred to a letter that was described as a confidential attorney-client communication. The court stated that the plaintiff "points to no evidence, other than the allegedly privileged communications themselves, which would substantiate these claims." *Id.* at *9. The court found a waiver of the attorney-client privilege because "[t]he only way for defendants to refute these assertions is to examine the privileged communications themselves." *Id.* Here, the interrogatory responses upon which Bel Fuse relies demonstrate that Murata can, and does, point to evidence other than privileged communications to substantiate its position.

Similarly, in *Starsight Telecast,* the defendant hoped to refute a claim of inequitable conduct by reliance on deposition testimony and declarations about knowledge of the purported prior art, and the relevancy or materiality of such art. 158 F.R.D. at 654. That testimony, however, relied completely on references to privileged attorney-client communications. *Id.* As such, the court, following *General Elec.,* found a waiver of the attorney-client privilege. Again, the interrogatory responses at issue here make reference to non-privileged materials.

**\*8** To make clearer the distinctions between the cases Bel Fuse cites and the situation at hand, one need only compare the testimony of the inventors in the three cases. In *General Elec.,* the inventors testified that they had no recollection of the experiment at issue, and that could be substantiated only by reference to privileged materials. In *Starsight Telecast,* the inventor testified that his decisions to disclose prior art were part and parcel to attorney-client communications. Here, the cited inventor testimony-that

of Mr. Hori-indicates that the inventor simply did not consider the #847 patent as relevant prior art that needed to be disclosed. (*Bel Fuse's Ex. 6,* at 45). Why? Because it "belonged to a completely unrelated category." (*Id.* at 52). There is no reference to a confidential communication and Mr. Hori's assertion can be assessed without resort to examining one. It is an assessment that can be made by comparison of the prior art at issue, and no resort to attorney-client confidences need be made. [4]

In sum, the flaws inherent in Bel Fuse's position can-as with its previous argument-readily be highlighted by what would obtain were it accepted. *See* Posner, Cardozo: A Study in Reputation, 118 (1990) (" '[t]he soundness of a conclusion may not infrequently be tested by its consequences.' "). Any defendant in any patent infringement case could destroy its opponent's attorney-client privilege by leveling the rather common charge of inequitable conduct before the patent office. The plaintiff denies the charge, thereby placing its state of mind at issue and *voila,* the defendant has access to the plaintiff's privileged communications with its counsel. It would happen in every case. That it has not is persuasive evidence that the argument is unsound and should be rejected.

## CONCLUSION

For the foregoing reasons, the defendant's Motion to Compel [# 260] is DENIED.

### All Citations

Not Reported in F.Supp.2d, 2007 WL 781252

Footnotes

1    The #204 patent refers to U.S. Patent No. 5,015,204 which is owned by Murata and which is mentioned in the Background of the Invention section of the patent-in-suit.

2    This purported "waiver" of the attorney-client privilege occurred nearly three years ago. The fact that Bel Fuse chose not to raise the issue until now, rather than during the ongoing, protracted discovery disputes during that period, calls into question the seriousness of Bel Fuse's contentions.

3    The two cases upon which Bel Fuse relies do not suggest a different result; both involved revelations of the substance of a confidential communication. *Vardon Golf Co., Inc. v. Karsten Mfg. Corp.,* 213 F.R.D. 528, 532 (N.D.Ill.2003) (privilege can be waived when a party shares the confidential information with third parties); *In re Consolidated Litigation Concerning Intern. Harvester's Disposition of Wisconsin Steel,* 666 F.Supp. 1148, 1153 (N.D.Ill.1987) (privilege waived where substance of the communication is revealed to third parties). The communications Bel Fuse pints to here were either not confidential or their substance was not divulged.

**4**     The testimony cited here is not far removed from a mere denial of inequitable conduct which, under *Lorenz,* 815 F.2d at 1097, does not warrant a finding of waiver. As such, this case is similar to *Schofield v. U.S. Steel Corp.* There, the party asserting waiver relied on the testimony of the patentee's attorney, who said he "certainly never intentionally prepared an application with a claim which read on some prior art which [he] was aware of." The court found that the patentee, through his attorney, had merely denied allegations of inequitable conduct leveled at him by the defendant. It held that the denial of an allegation does not constitute waiver of the attorney-client privilege. *Schofield v. U.S. Steel Corp.,* 2005 WL 3159165, *5 (N.D.Ind.2005) (*citing Lorenz,* 815 F.2d at 1098).

---

**End of Document**                                           © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

2011 WL 2490298
Only the Westlaw citation is currently available.
United States District Court,
D. Minnesota.

PETCO ANIMAL SUPPLIES STORES,
INC., and International Pet Supplies
and Distribution, Inc., Plaintiffs,
v.
INSURANCE COMPANY OF
NORTH AMERICA, Defendant.

Civil No. 10–682(SRN/JSM).
|
June 10, 2011.

**Attorneys and Law Firms**

David J. Taylor, Jeffrey M. Baill, Steven Theesfeld, Yost
& Baill, LLP, Minneapolis, MN, for Plaintiffs.

John F. Angell, Cindy L. Butler, Louise A. Behrendt,
Stacey L. Sever, Stich Angell Kreidler & Dodge,
Minneapolis, MN, for Defendant.

*ORDER*

JANIE S. MAYERON, United States Magistrate Judge.

**\*1** The above matter came on before the undersigned
on Plaintiffs' and Aaron Ponce's Motion to Quash the
Subpoena Issued to Aaron Ponce [Docket No. 28].
Thomas A. Harder, Esq. and David Taylor, Esq. appeared
on plaintiffs' and Aaron Ponce's behalf. Cindy Butler,
Esq. and John Angell, Esq. appeared on defendant's
behalf. Based upon all the files, records and proceedings
herein, the arguments of counsel, and the supplemental
briefing ordered by the Court, Plaintiff's Motion to Quash
Subpoena [Docket No. 28] is GRANTED.

*MEMORANDUM*

**I. BACKGROUND**
Medtronic sued PETCO Animal Supplies Stores, Inc.
and International Pet Supplies and Distribution, Inc. [1]
(collectively "PETCO") after an aquarium heater
Medtronic purchased from PETCO allegedly overheated

and caused a fire at one of Medtronic's facilities. Amended
Complaint, ¶¶ 8, 9, Civ. No. 09–363 (DWF/JSM) [Docket
No. 59] (the "Medtronic action"). Medtronic claimed
damages in excess of $1,800,000. Rule 26(f) Report, p. 2
[Medtronic action, Docket No. 8]. The Yost & Baill law
firm represented Medtronic in that action. *Id.,* p. 7. Aaron
Ponce, Esq. of the law firm Foley and Mansfield PLLP
represented PETCO. Answer to Amended Complaint, p.
7, [Medtronic action, Docket No. 60].

The aquarium heater was designed and manufactured by
Meiko Pet Corporation ("Meiko"). Amended Complaint,
¶ 15, Civ. No. 10–682 (SRN/JSM) (the "DJ action")
[Docket No. 14]. PETCO claimed they were covered under
a vendors broad form endorsement in an insurance policy
that defendant Insurance Company of North America
("ICNA") issued to Meiko (the "Meiko policy"). *Id.,* ¶
16, 37. PETCO began the instant DJ action after ICNA
refused PETCO's tender of defense and claim for coverage
under the Meiko policy. *Id.,* ¶¶ 23, 51–52. PETCO was
represented in the DJ action by the Henson & Efron law
firm. *Id.,* p. 11. The Amended Complaint in the DJ action
alleged that the Meiko policy had a $2,000,000 liability
limit and that Medtronic was seeking approximately
$1,800,000 for its losses. Amended Complaint, ¶¶ 12, 14.
ICNA answered the Amended Complaint, denying that
the Meiko policy provided coverage for PETCO. Answer
to Amended Complaint, ¶ 8 [DJ action, Docket No. 22].

On October 27, 2010, this Court conducted a settlement
conference for both the Medtronic action and the DJ
action. [Medtronic action, Docket No. 65; declaratory
judgment action, Docket No. 24]. In attendance were
attorneys and client representatives for Medtronic and
PETCO, insurer Chartis (insurer to PETCO after PETCO
reached its self-insured retention limit), and counsel and
the client representative for ICNA. During the settlement
conference, Medtronic and PETCO agreed to enter into a
*Miller–Shugart* Agreement and Assignment. *See* Affidavit
of Thomas Harder ("Harder Aff."), Ex. A, (Affidavit
of Aaron Ponce), ¶ 3 [Docket No. 31]; Affidavit of
Cindy Butler ("Butler Aff."), Ex. 1 (draft of *Miller–
Shugart* Agreement and Stipulation and *Miller–Shugart*
Assignment) [Docket No. 34–1]. [2]

**\*2** Pursuant to the *Miller–Shugart* Agreement, PETCO
and Medtronic agreed as follows:

PETCO Animal Supplies Stores, Inc. v. Insurance Co. of..., Not Reported in...

CASE 0:16-cv-00139-DWF-LIB   Document 65   Filed 08/17/17   Page 25 of 44

(1) As a direct and proximate cause of a malfunction in the aquarium heater, Medtronic suffered property damage and business interruption losses in the total amount of $2,031,705.92—an amount that included prejudgment interest and taxable costs. Butler Aff., Ex. 1, p. 1

(2) ICNA's policy provided liability coverage to indemnify PETCO and IPSD from negligence claims in the amount of $2,000,000 annual aggregate limit and $2,000,000 occurrence limit. *Id.,* pp. 1, 2

(3) There was a strong likelihood that a reasonable and impartial jury would find that Medtronic suffered damages in the amount of $1,746,000, consisting of $1,296,000 in total inventory write-off and $450,000 in "total Non–OP Expense (personnel costs and outside vendor services). *Id.,* p. 3

(4) Defendants incurred attorneys' fees and expenses in defense of the Medtronic action and in pursuing insurance coverage in the DJ action in the amount of $286,762.78. *Id.*

(5) Medtronic would be entitled to prejudgment interest from the date of the fire (May 20, 2007) plus taxable costs, totaling $184,166.19. *Id.*

(6) At the settlement conference on October 27, 2010, PETCO made a settlement demand to ICNA and put ICNA on notice that it intended to enter into a *Miller–Shugart* Agreement if ICNA continued to deny coverage. ICNA continued to deny coverage and did not make any reasonable offers to settle Medtronic's claims. PETCO put ICNA on notice of the possibility of a *Miller–Shugart* Agreement on July 9, 2010 and continued to warn ICNA about such an agreement up through the date of the settlement conference on October 27, 2010. *Id.,* pp. 4–5, 7.

(7) PETCO stipulated to judgment against them in the amount of $1,050,000, plus prejudgment interest and taxable costs. The amount "[was] based on a careful assessment of the nature and extent of Plaintiff's damages, analysis of liability risks, uncertainty regarding a decision on a pending motion from the Federal Magistrate regarding the admissibility of Defendants' sole expert's testimony, and Defendant's self-insured retention before their excess carrier would provide coverage, and of what a reasonable and

impartial jury would likely and reasonably return." Medtronic agreed to seek recovery for this judgment only from ICNA or any other insurer of Meiko, and not PETCO. *Id.,* p. 5, ¶¶ 1–2; p. 5, ¶ 6.

(8) PETCO agreed to assign their claims against ICNA for coverage and defense costs to Medtronic. *Id.,* p. 6, ¶ 4.

(9) PETCO agreed to pay Medtronic $63,237.22 as additional damages, and their insurer Chartis, agreed to pay $286,762.78, [3] for a total of $350,000. In the event that Medtronic recovered any amounts from ICNA or others, Medtronic agreed to pay back to PETCO up to the amount of $350,000 based on how much was recovered by Medtronic from these other sources. *Id.,* pp. 8–9, ¶¶ 13, 14.

**\*3** PETCO and Medtronic also entered into a *Miller–Shugart* Assignment, under which PETCO assigned their claims against ICNA and Meiko to Medtronic. Butler Aff., p. 14. The Assignment required PETCO to cooperate with Medtronic in its prosecution of claims against ICNA, including meeting with Medtronic's lawyers to discuss facts underlying the claims and to provide testimony, if required. *Id.,* p. 14.

The Medtronic action was dismissed with prejudice on December 17, 2010, based on the parties' stipulation. [Medtronic action, Docket Nos. 66, 67 and 68].

On October 28, 2010, the day after the settlement conference, Henson & Efron withdrew as counsel for PETCO in the DJ action and Yost & Baill, Medtronic's attorneys, substituted for Henson & Efron. *See* Notice of Withdrawal and Substitution of Counsel [DJ action, Docket No. 23]. On December 3, 2010 ICNA subpoenaed Aaron Ponce, PETCO's attorney in the Medtronic action. Harder Aff., Ex. B (Subpoena to Testify at a Deposition or to Produce Documents in a Civil Action) [Docket No. 31]. The subpoena sought Ponce's testimony at a deposition and the production of the following documents:

1. Any and all correspondence by or between the attorneys or insurers including but not limited to the insurance claims handlers, representatives, or adjusters, for any of the named parties in the case entitled, *Medtronic, Inc. v. PETCO Animal Supplies Stores, Inc., and International Pet Supplies and Distribution, Inc.,*

United States District Court Case No. 0:09–cv–00363–DWF–JSM

2. Any and all documents pertaining to the evaluation of the matter by or on behalf of any of the named parties, their attorneys, or their insurers in the case entitled *Medtronic, Inc. v. PETCO Animal Supplies Stores, Inc., and International Pet Supplies and Distribution, Inc.,* United States District Court Case No. 0:09–cv–00363–DWF–JSM, including but not limited to the claims file and claims notes, settlement evaluations, recommendations, demands or requests, and reserves.

3. Copies of statements by parties or non-parties in your possession or under your control. For the purpose of this Request, a statement is (a) a written statement signed or otherwise adopted or approved by the person making it, or (b) a stenographic, mechanical, electrical or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement by the person making it and contemporaneously recorded.

4. Any and all pleadings and discovery responses, including but not limited to responses to Interrogatories, Requests for Production, and Requests for Admissions, Orders, Notices and correspondence from the Court, memoranda, briefs and any documents submitted on any motion.

5. Any and all documents regarding any individual you expect to call as an expert witness at trial of this matter, whom you have consulted in anticipation of litigation or preparation for trial, or who has provided an evaluation of this matter in the case entitled *Medtronic, Inc. v. PETCO Animal Supplies Stores, Inc., and International Pet Supplies and Distribution, Inc.,* United States District Court Case No. 0:09–cv–00363–DWF–JSM, including but not limited to the individual's curriculum vitae, the individual's report, opinions, findings, or evaluation, and any photographs, tests, results or other bases used, considered or relied upon by the individual in rendering such a report, opinion, finding or evaluation.

**\*4** *Id.*

This matter is now before the Court on PETCO and Ponce"s motion to quash the subpoena.

## II. PLAINTIFFS' MOTION TO QUASH SUBPOENA

Pursuant to Fed. R. Civ. Procedure 45(c)(3)(A)(iii) and (iv), "[o]n timely motion, the issuing court must quash or modify a subpoena that * * * (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or (iv) subjects a person to undue burden. The court has the discretion to determine when it is appropriate to quash a subpoena pursuant to Rule 45. *Pamida, Inc. v. E.S. Originals, Inc.,* 281 F.3d 726, 728 (8th Cir.2002); *Miscellaneous Docket Matter # 1 v. Miscellaneous Docket Matter # 2,* 197 F.3d 922, 925 (8th Cir.1999).

PETCO and Ponce moved to quash the subpoena because it sought "information [ICNA] knows is subject to the attorney-client privilege and the work product doctrine." Plaintiffs' Memorandum of Law in Support of Motion to Quash ("Pl.Mem."), p. 4 [Docket No. 30]. Additionally, PETCO and Ponce submitted that the non-privileged information ICNA sought such as statements, pleadings and discovery, could be obtained through other sources. *Id.,* p. 7.

In response, ICNA argued that Ponce's deposition and the documents it sought were essential to determining the reasonableness (and therefore the enforceability) of the *Miller–Shugart* Agreement, or whether the settlement was obtained through fraud or collusion. Defendant's Memorandum of Law in Opposition to Motion to Quash ("Def.Mem."), pp. 4–13 [Docket No. 33]. According to ICNA, claims of privilege do not apply or are waived where parties have entered into a *Miller–Shugart* agreement, and courts have "repeatedly considered evidence derived from the depositions of attorneys who represented the parties in the underlying litigation" when inquiring into the reasonableness (and, therefore, the enforceability) of such an agreement. *Id.,* pp. 7–9. Further, ICNA asserted both the substitution of PETCO's counsel with Medtronic's counsel, Yost & Baill, in the DJ action, and the language of the *Miller–Shugart* Agreement itself, which required PETCO to cooperate with Medtronic, establishes that Medtronic and PETCO contemplated a waiver of the attorney-client privilege and work product doctrine. *Id.,* p. 11. As to the effect of the substitution of counsel, ICNA maintained that Yost & Baill "inevitably carry with them the information, documents, opinions, work product, etc. that they obtained or rendered in the course and scope of representation of Medtronic." *Id.,* p. 10. Consequently, once Yost & Baill became PETCO's counsel in the DJ action, all of its attorney-client

CASE 0:16-cv-00139-DWF-LIB Document 65 Filed 08/17/17 Page 27 of 44

PETCO Animal Supplies Stores, Inc. v. Insurance Co. of..., Not Reported in...

communications, work product documents, opinions, and legal research relating to the Medtronic action were "inherently communicated and/or provided to PETCO, waiving any privileges that would otherwise attach to such knowledge and materials." *Id.* Second, by requiring PETCO to cooperate with Medtronic in the DJ action, any privileges that may have applied to the information sought by ICNA via the subpoena have been waived. *Id.,* p. 11. Finally, ICNA argued that the requested discovery should be allowed pursuant to Fed.R.Civ.P. 26(b)(3), which provides that parties may access materials otherwise protected by the work product doctrine on a showing of substantial need and the inability, without undue hardship, of obtaining their substantial equivalent elsewhere. *Id.,* p. 6.

**\*5** Deciding PETCO's and Ponce's motion to quash ICNA's subpoena requires a brief review of *Miller–Shugart* settlements, as judicial construction of those settlements is central to ICNA's position that courts have recognized an implied waiver of privileged and protected materials in the context of *Miller–Shugart* settlements.

### A. *Miller–Shugart Settlements*

When an insurance carrier denies coverage for a liability claim brought by its insured, the insured and plaintiff may agree to entry of judgment against the insured, on the condition that the judgment is collectible only from the insurer. *Miller v. Shugart,* 316 N.W.2d 729, 734 (Minn.1982); *see also Peterson v. Wilson Twp.,* 672 N.W.2d 556, 557, n. 1 (Minn.2003) (same). In *Miller v. Shugart,* a plaintiff injured in a car accident and two defendants (the driver and owner of the car), entered into a settlement in which the defendants stipulated to judgment in the amount of $100,000. This amount was twice the limits of the Milbank Mutual Insurance Company policy insuring the car. *Id.* at 732. The settlement was reached during the pendency of Milbank's appeal of the district court's decision that Milbank's policy covered both the driver and owner of the car and after plaintiff had commenced her personal injury action against both defendants. *Id.* Milbank was advised twice by the defendants' counsel that he was negotiating a settlement with the plaintiff. Milbank was invited to participate in the negotiations, but refused, indicating that it believed it could not do so until the coverage question was decided on appeal. *Id.*

When the plaintiff served a garnishment summons on Milbank for the judgment, Milbank answered, alleging that it was not bound by the judgment. *Id.* The parties then filed cross-motions for summary judgment—plaintiff for the policy limits of $50,000 and Milbank for an order that the confessed judgment was invalid. *Id.*

The Minnesota Supreme Court analyzed the validity of the settlement agreement under a two-part test: (1) whether the agreement was the product of fraud or collusion perpetuated on the insurer by the settling parties; and (2) whether the judgment amount reflected a reasonable and prudent settlement. *Id.* at 733. Milbank complained that fraud and collusion were evidenced by the parties settling their claims over its objections and contrary to the insurer's best interests and in stipulating to judgment for twice the policy limits. *Id.* at 734. The court found otherwise, noting that there was nothing about this conduct that was necessarily fraudulent, particularly since the plaintiff recognized that Milbank's policy limit was $50,000 and sought no more than that amount in her motion for summary judgment. *Id.* In addition, the defendant insureds had a right to make a settlement relieving them of liability, and they notified Milbank of what they were doing. Under those facts, the court concluded that there was no fraud or collusion as a matter of law. *Id.*

**\*6** Having determined the settlement was free of fraud or collusion, the court turned to the second prong of the test of enforceability—whether the settlement was reasonable and prudent. *Id.,* p. 735. The court held that the plaintiff (now a judgment creditor) bears the burden of proof on the question of reasonableness, to which the court applied an objective standard: "[t]he test as to whether the settlement is reasonable and prudent is what a reasonably prudent person in the position of the defendant would have settled for on the merits of plaintiff's claim. This involves a consideration of the facts bearing on liability and damage aspects of plaintiff's claim, as well as the risks of going to trial...." *Id.* The court noted the evidence that the plaintiff was injured as the passenger in a single-car accident in which the car left the road and hit a tree. As to damages, Milbank did not dispute that the plaintiff suffered "severe and disfiguring personal injuries." Further, Milbank's counsel reviewed the liability and damages aspects of the claim and concluded that "there was a substantial likelihood that ultimately judgment would be entered against his clients

CASE 0:16-cv-00139-DWF-LIB   Document 65   Filed 08/17/17   Page 28 of 44

PETCO Animal Supplies Stores, Inc. v. Insurance Co. of..., Not Reported in...

\* \* \* for more than any possible insurance coverage." *Id.* at 736. On these facts, the court concluded that the settlement was reasonable and prudent as a matter of law. *Id.* Key to the court's decision to approve the settlement was its consideration of the competing interests of the insurer and the insured:

> If the insurer ignores the "invitation" to participate in the settlement negotiations, it may run the risk of being required to pay ... an inflated judgment. On the other hand, if the insurer decides to participate in the settlement discussions, ordinarily it can hardly do so meaningfully without abandoning its policy defense. Nevertheless, it seems to us, if a risk is to be borne, it is better to have the insurer who makes the decision to contest coverage bear the risk.

*Id.* at 734; *see also* Theodore J. Smetak, *Minnesota Commercial General Liability Insurance Policy: Annotated,* at 23 (2008) ("[t]he essence of the Miller Shugart agreement is grounded in concepts long recognized in Minnesota law. The Miller Shugart agreement is, in part, an attempt to balance an insured's duty to cooperate with that party's right to protect itself during a period of disputed coverage").

In the nearly thirty years since *Miller v. Shugart* was decided, Minnesota courts have further refined the test for the enforceability of these agreements. *Id.* at 12 (noting that the "elements of the Miller Shugart emerged somewhat haltingly over several years before the doctrine became reasonably accepted.").

In general, a *Miller–Shugart* settlement will be enforceable against the insurer if:

> 1) The insurer has denied all obligations to pay damages on behalf of the insured;
>
> 2) The insurer (if it is not deemed to have waived notice) has received notice of the settlement and an "opportunity" to participate;
>
> **\*7** 3) The insured is left without coverage by any other insurer to pay the claimed damages;

> 4) The settlement amount is later deemed to be reasonable;
>
> 5) The insured could have liability to the claimant;
>
> 6) The settlement was not the product of fraud or collusion; and
>
> 7) Coverage is ultimately determined to exist for the claim that became a judgment.

*Id.* at 23; *see also Hartfiel v. McLennan,* 430 N.W.2d 215, 219 (Minn.Ct.App.1988) (genuine issues of material fact regarding defendant's comparative fault for accident preclude summary judgment on the reasonableness of a *Miller–Shugart* settlement); *Steen v. Those Underwriters at Lloyds, London,* 442 N.W.2d 158, 164 (Minn.Ct.App.1989) (if settling defendant breaches the duty of cooperation clause of its policy, *Miller–Shugart* agreement may be void); *Buysse v. Baumann–Furrie & Co.,* 481 N.W.2d 27, 29 (Minn.1992) (an "authentic" *Miller–Shugart* agreement requires that the insurer has denied all coverage); *Bob Useldinger & Sons, Inc. v. Hangsleben,* 505 N.W.2d 323, 330 (Minn.1993) (holding that when the insurer admits to some coverage, a *Miller–Shugart* settlement will be deemed to be in bad faith); *Independent Sch. Dist. 197 v. Accident & Cas. Ins.,* 525 N.W.2d 600, 607 (Minn.Ct.App.1995) (evidence of collusion and lack of reasonableness include settlement for twice the plaintiff's claimed compensatory damages and plaintiff's retaining defendant's national insurance counsel to pursue coverage claims against the insurers); *Burbach v. Armstrong Rigging & Erecting, Inc.,* 560 N.W.2d 107, 109–10 (Minn.Ct.App.1997) (insurer not deemed to have denied all coverage when it made a substantial offer of settlement).

"Collusion, for purposes of a *Miller–Shugart* settlement, is a lack of opposition between a plaintiff and an insured that otherwise would assure that the settlement is the result of hard bargaining." *Independent Sch. Dist. 197,* 525 N.W.2d at 607. "In most cases, the only potential collusion is between the insured and the plaintiff, and the collusion inquiry is therefore satisfied by determining if the settlement is reasonable." *Koehnen v. Herald Fire Ins. Co.,* 89 F.3d 525, 529 (8th Cir.1996) (citation omitted). But a settlement that shifts financial liability from one insurer to another insurer is collusive as a matter of law when the insurer from whom the settlement funds are collectible was deprived of an opportunity to participate in the settlement

PETCO Animal Supplies Stores, Inc. v. Insurance Co. of..., Not Reported in...

CASE 0:16-cv-00139-DWF-LIB   Document 65   Filed 08/17/17   Page 29 of 44

process." *Id.* at 530; *Burbach,* 560 N.W.2d at 110 ("[it was never the intent of *Miller–Shugart* to shift the risk of defense and coverage from one insurer to another.")

The Minnesota Supreme Court described the process for evaluating the reasonableness of a *Miller–Shugart* settlement in *Alton M. Johnson Co. v. M.A.I. Co.*:

> The ultimate issue to be decided is the reasonableness of a settlement which avoids a trial. Reasonableness, therefore, is not determined by conducting the very trial obviated by the settlement. Consequently, the decisionmaker receives not only the customary evidence on liability and damages but also other evidence, such as expert opinion of trial lawyers evaluating the "customary" evidence. This "other evidence" may include verdicts in comparable cases, the likelihood of favorable or unfavorable rulings on legal defenses and evidentiary issues if the tort action had been tried, and other factors of forensic significance. The evaluation of this kind of proof is best understood and weighed by a trial judge.

**\*8** 463 N.W.2d 277, 279 (Minn.1990).

The court re-emphasized the multi-factorial nature of the reasonableness inquiry in connection with *Miller–Shugart* settlements in *Jorgenson v. Knutson,* 662 N.W.2d 893 (Minn.2003). There, the court stated that it was error for the Minnesota Court of Appeals to focus its inquiry into the reasonableness of a *Miller–Shugart* settlement solely on what amount of damages the jury could have awarded, noting:

> "what a jury could award" is an appropriate factor in assessing the reasonableness of a *Miller–Shugart* settlement, [but] it cannot be considered in isolation. The court must also consider all the other relevant factors that we mentioned in *Miller v. Shugart* ... such as

an undisputed injury; the risks of trial; expert testimony for both parties on issues of the likely size of a jury award, the extent of damages and liability; and the judge's own personal experience with jury awards in similar areas.

*Id.* at 904.

Based on these factors, courts considering the reasonableness of a *Miller–Shugart* settlement have relied on settlements or jury verdicts in similar cases, (*McNicholes v. Subotnik,* 12 F.3d 105, 110 (8th Cir.1993)); expert deposition testimony on the reasonableness of the settlement, (*Brownsdale Co-op Ass'n v. Home Ins. Co.,* 473 N.W.2d 339, 342 (Minn.Ct.App.1991)); and expert opinion testimony on the possible total jury damage award, (*Schmid v. Fireman's Fund Ins. Co., Inc.,* Civ. No. 98–2355 (ADM/AJB), 2001 WL 1640029 at \*4 (D.Minn. Dec. 19, 2001)); *D.E.M. v. Allickson* 555 N.W.2d 596, 603 (N.D.1996) (affirming district court's finding that *Miller–Shugart* settlement of $300,000 was reasonable, based in part on plaintiff's expert's testimony that, "based on his vast experience," a jury could have returned a verdict up to $1.8 million)).

Courts have also relied on the opinions of attorneys retained as experts to support or defeat a Miller–Shugart settlement. *See Burbach,* 560 N.W.2d at 111 (error for the district court to fail to address an affidavit by insurer's expert attorney stating that the settlement amount was unreasonable); *S.G. v. St. Paul Fire & Marine Ins. Co.,* 460 N.W.2d 639, 644 (Minn.Ct.App.1990) (insured produced *prima facie* evidence of the reasonableness of the *Miller–Shugart* settlement in the form of opinions in affidavits from several lawyers, together with defendant's knowledge of the facts of his own negligence).

Offering expert opinions from attorneys who are strangers to the case is a far different matter, however, from requiring a lawyer representing one of the settling parties to submit to a deposition regarding his opinion of the settlement and other settlement-related topics. At the core of ICNA's opposition to PETCO and Ponce's motion to quash is its argument that it is entitled to Ponce's testimony to defend against the *Miller–Shugart* settlement. This Court found no support for that position in any of the cases cited above or in any of the cases cited by ICNA. Further, the Court uncovered no support

PETCO Animal Supplies Stores, Inc. v. Insurance Co. of..., Not Reported in...

CASE 0:16-cv-00139-DWF-LIB   Document 65   Filed 08/17/17   Page 30 of 44

for ICNA's argument that the courts of this jurisdiction have recognized a *per se* "implied waiver" of the attorney-client privilege and work product protection when parties enter into a *Miller–Shugart* settlement or where the settling insured (*i.e.* PETCO) assigned its coverage claim to the plaintiff (*i.e.* Medtronic) in the underlying action and plaintiff's counsel took over the prosecution of the coverage case. As described more fully below, this Court concludes that PETCO and Ponce's motion to quash ICNA's subpoena should be granted.

### B. Waiver of Attorney–Client Privilege and Work Product Protection by Entering into a *Miller–Shugart* Settlement

**\*9** In a case in federal court based on diversity, the Court "applies federal law to resolve work product claims and state law to resolve attorney-client privilege claims." *Baker v. General Motors Corp.,* 209 F.3d 1051, 1053 (8th Cir.2000) (citing *Simon v.. G.D. Searle & Co.,* 816 F.2d 397 (8th Cir.1987)). *See also Union County, Iowa v. Piper Jaffray & Co., Inc.,* 525 F.3d 643, 646 (8th Cir.2008) ("Because this is a diversity case, the determination of whether attorney-client privilege applies is governed by state law."); *PepsiCo, Inc. v. Baird, Kurtz & Dobson LLP,* 305 F.3d 813, 817 (8th Cir.2002) ("This Court applies federal law to work product claims.").

The attorney-client privilege is defined in Minn.Stat. § 595.02(b). [4] The essential elements of the attorney-client privilege are: "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or the legal advisor, (8) except the privilege may be waived." *Kobluk v. University of Minn.,* 574 N .W.2d 436, 440 (Minn.1998). "An attorney cannot, without the consent of the attorney's client, be examined as to any communication made by the client to the attorney or the attorney's advice given thereon in the court of professional duty * * *, without the client's consent." *Id.* n. 4 (citing Minn.Stat. § 595.02, subd. 1(b) (1996)). The privilege is strictly construed and protects communications, not information. *Id.* at 443 ("[T]he attorney-client privilege protects communications rather than information except to the extent that * * * disclosure would reveal confidential communications.") (internal quotation and citation omitted).

Because the attorney-client privilege belongs to the client, it may be waived explicitly by the client. *Id.* at 440. In addition, the attorney-client privilege may be impliedly waived. *State v. Walen,* 563 N.W.2d 742, 753 (Minn.1997) (citations omitted). [5] In *Baker,* the court stated that "a waiver of the attorney-client privilege may be found where the client places the subject matter of the privileged communication at issue" and then described "two situations in which at-issue waiver is commonly found." 209 F.3d at 1055.

The first is when proof of a party's legal contention implicates evidence encompassed in the contents of an attorney-client communication-for example, when a client uses reliance on legal advice as a defense or when a client brings a legal malpractice action. *See State v. Campbell,* 913 S.W.2d 832, 837 (Mo.Ct.App.1995); *see also People v. Mitchell,* 454 Mich. 145, 560 N.W.2d 600, 612 n. 27 (Mich.1997) (defendant who asserts ineffective assistance of counsel waives attorney-client privilege). The second is when a client's testimony refers to a specific privileged document. *See, e.g., Charles Woods Television Corp. v. Capital Cities/ABC, Inc.,* 869 F.2d 1155, 1162 (8th Cir.1989) (applying Missouri law to find no at-issue waiver when witness testified generally about an issue and never mentioned any particular communication); *McCarthy[v. Belcher* ], 340 N.W.2d at 850 (attorney-client privilege waived when client testifies on direct examination about a communication).

**\*10** *Id.; see also* Walen, 563 N.W.2d at 752 ("[o]ne type of implicit waiver occurs when the client alleges a breach of duty to him by the attorney.") (quotation omitted); Plaintiffs' Supplemental Memorandum of Law in Support of the Motion to Quash the Subpoena ("Pl.Supp.Mem."), pp. 3–4 ("Implied waiver occurs when a client sues a former attorney for malpractice, a client testifies about an attorney-client communication, a client asserts 'advice of counsel' as a defense, ... [or] when a party intends to prove its case or an affirmative defense through the use of privileged material.") (citations omitted).

The attorney work product doctrine was first articulated in *Hickman v. Taylor,* 329 U.S. 495, (1947), and later expressed in Fed. Rule Civ. P. 26(b)(3)(A), which provides:

> Ordinarily, a party may not discover documents and tangible things

CASE 0:16-cv-00139-DWF-LIB Document 65 Filed 08/17/17 Page 31 of 44

PETCO Animal Supplies Stores, Inc. v. Insurance Co. of..., Not Reported in...

that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered ... if ... the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

The work product protection is not absolute, however, and it too may be waived. *United States v. Nobles,* 422 U.S. 225, 239 (1975); *see also In re Chrysler Motors Corp.,* 860 F.2d 983, 988 (8th Cir.1997) (disclosure to an adversary waives work product protection as to items actually disclosed). Even the nearly absolute immunity of attorney-opinion work product may be lost if a client places his attorney's opinions into direct issue by designating his attorney as an expert witness. *Minnesota Speciality Crops, Inc. v. Minnesota Wild Hockey Club, L.P.,* 210 F.R.D. 673, 677 (D.Minn.2002) (citing *Hager v. Bluefield Reg'l Med. Ctr., Inc.,* 170 F.R.D. 70, 78 (D.D.C.1997)). Further, the work product privilege extends beyond the termination of litigation. *In re Murphy,* 560 F.2d 326, 334 (8th Cir.1977).

At the same time, even if a party can meet the requirement of substantial need, and the court orders discovery of work product materials, the court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. Rule Civ. P. 26(b)(3)(B).

Ponce's former clients PETCO and IPSD have not voluntarily waived the attorney-client privilege and vigorously oppose Ponce's deposition. Pl. Mem., pp. 6, 7. Additionally, PETCO and Ponce have claimed that the materials ICNA seeks are "wrought with the analysis of legal theories, opinions, conclusions, and mental impressions of counsel which must be insulated from discovery by ICNA." *Id.,* p. 7. ICNA does not point to an express waiver of the PETCO plaintiff's attorney-client privilege or Ponce's work product. Rather, its theory is that PETCO impliedly waived the attorney-client

privilege and work-product protection when it entered into a *Miller–Shugart* settlement, obtained Medtronic's agreement to cooperate, and retained Medtronic's counsel from the Medtronic action to represent it in the instant case. Def. Mem., pp. 7–10; *see also* Defendant's Supplemental Responsive Memorandum of Law In Opposition To Motion To Quash The Subpoena ("Def. Supp. Reply Mem."), p. 3 [Docket No. 41] ("Medtronic and PETCO affirmatively, and voluntarily, chose to take three specific actions that have placed their privileged information at issue: 1) Medtronic and PETCO chose to enter into a Miller–Shugart agreement; 2) Medtronic and PETCO chose to seek enforcement of the agreement exclusively against INA; and 3) Medtronic and PETCO chose to substitute PETCO's counsel with that of Medtronic's to prosecute the insurance coverage and enforcement actions.").

**\*11** Initially, ICNA relied on *Corn Plus Coop. v. Continental Cas. Co.,* Civ. No. 04–4270, 2007 WL 107676 (D.Minn. Jan. 9, 2007) to support its theory that when a party enters into a *Miller–Shugart* settlement, its counsel can be required to testify in the coverage action. Def. Mem., pp. 7–8. In that case, Corn Plus sued Wanzek Construction in federal court, alleging negligence and breach of contract in connection with Wanzek's work on Corn Plus's ethanol plant. *Corn Plus,* 2007 WL 107676 at \*1. Wanzek then sued Corn Plus in state court for foreclosure of a mechanic's lien it held on the plant and Corn Plus counterclaimed, alleging the same claims it had asserted in the federal suit. *Id.; see also* Order Oct. 5, 2006 at p. 2 [Corn Plus Docket No. 187]. Wanzek's insurer, CNA, subsequently filed a declaratory judgment action in state court regarding its duty to defend and indemnify Wanzek. [Corn Plus Docket No. 187] (Order Oct. 5, 2006 at p. 2). Eventually, Wanzek and Corn Plus agreed to consolidate all the actions in the state court action and entered into a *Miller–Shugart* settlement pursuant to which Wanzek stipulated to a settlement of \$2,500,000, collectable from Wanzek's insurers. *Corn Plus,* 2007 WL 107676 at \*1. Thereafter, the state declaratory judgment action was removed to federal court, [6] and the insurers moved for summary judgment, arguing that the *Miller–Shugart* agreement was unenforceable because it was collusive and unreasonable as a matter of law. *Id.*

ICNA correctly points out that the court relied upon and cited extensively from the deposition transcripts of Kyle Hart and Jane Volz, attorneys for Corn Plus,

PETCO Animal Supplies Stores, Inc. v. Insurance Co. of..., Not Reported in...

CASE 0:16-cv-00139-DWF-LIB   Document 65   Filed 08/17/17   Page 32 of 44

and Barbara Burke, the attorney hired by Continental Casualty Company to represent Wanzek in the underlying litigation. Def. Mem., p. 8. In fact, the *Corn Plus* decision frequently references the attorneys' damages calculations and the basis of the settlement amount. *Id.* at *3 ("[a]ccording to Corn Plus's attorney, the $2,500,000 settlement represented all variables involved in the case, including the costs associated with the repair and replacement of the defective welds. (Volz Dep. at 193)"). A close examination of the pleadings in *Corn Plus,* however, indicates that neither Hart nor Volz ever opposed their depositions.

Continental Casualty served Hart with a subpoena duces tecum, which Hart did not oppose. [Corn Plus Docket No. 81]. Attorney Barbara Burke and the Cousineau McGuire law firm, which was retained by Continental Casualty Company to defend Wanzek in the underlying action, moved to quash the subpoena served upon them by Lumbermans—the Wanzek's excess carrier. [*Corn Plus* Docket No. 116]. Burke opposed the subpoena on the ground that it sought attorney-client privileged communications between Burke and her client Wanzek and work-product protected materials. [*Corn Plus* Docket No. 118] (Attorney Barbara Burke's and Cousineau McGuire's Memorandum of Law in Support of Motion to Quash Subpoena Duces Tecum, p. 10–12). Lumbermans' response to Burke's motion to quash indicated that in the interim between its service of the subpoena and its response, Wanzek provided a waiver of attorney-client privilege, thus resolving Burke's chief concern regarding the subpoena. [*Corn Plus* Docket No. 123] (Defendant Lumbermens' Mutual Casualty Company's Memorandum in Response to the To the Motion to Quash, p. 4 ("In light of the fact that a waiver has been secured ... Cousineau can now produce the documents."); p. 6 ( ["W"]hen Mr. Christensen did speak with Ms. Burke, the issues regarding the scope of the subpoena were resolved."). Burke's motion was denied without prejudice, and without the issuance of an order from the district court, no doubt a result of the parties' reaching an agreement on the subpoena. [*Corn Plus* Docket No. 134].

 **\*12** Notably, Hart represented Wanzek Construction in the underlying suit and then represented Corn Plus in the declaratory judgment action against the insurers to enforce the *Miller–Shugart* settlement. [*Corn Plus* Docket No. 187 (Order Oct. 5, 2006 at p. 3) ]. Hart's deposition contained the following exchange:

A. We formerly represented Wanzek, correct. * * *

Q. One of the things I was getting to way back when at the beginning of this deposition, Mr. Hart, is I haven't seen a judgment debtor's attorney end up representing a judgment creditor in a Miller–Shugart action before because its unusual. * * *

A. I don't know if it's unusual or not. I've not seen it often. I see nothing wrong with it, however.

[Corn Plus Docket No. 145–6 at p. 4].

Based in part on Hart's former representation of Wanzek, Continental Casualty moved to disqualify Volz, Hart and the Fabyanske law firm (of which Hart was a member) from continuing their representation of Corn Plus. [*Corn Plus* Docket No. 143] (Continental's Memorandum of Law in Support of its Motion to Disqualify the Fabyanske Law Firm and Jane Volz from Further Representation of Corn Plus in this Action). Former Magistrate Judge Susan Richard Nelson denied that motion, noting that "[Fabyanske] may represent Corn Plus and Wanzek without significant risk of one representation materially limiting the other." [Corn Plus Docket No. 187] (Order Oct. 5, 2006 at p. 9). In so doing, Judge Nelson determined that the interests of Corn Plus and Wanzek were not adverse in the declaratory judgment action, (*Id.* at pp. 7–8), and that their interests were "entirely aligned." *Id.* at p. 9.

These facts do not support ICNA's position that the court in *Corn Plus* recognized an implied waiver of the attorney-client privilege or work-product doctrine. The court was never called upon to reach that conclusion, and there is nothing to indicate that the attorneys' testimony was anything but voluntary. Indeed, there no discussion in the *Corn Plus* decision that the *Miller–Shugart* settlement itself operated as a waiver of attorney-client privilege or that Hart's substitution as attorney for Corn Plus after representing Wanzek acted as a waiver. To the contrary, the court found that Hart's prior representation of Wanzek and then substitution as counsel for Corn Plus in the coverage action was completely proper as their interests were "entirely aligned."

Similarly, there is no indication in *Zurich Reinsurance v. Canadian Pacific,* 613 N.W.2d 760 (Minn.Ct.App.2000), also cited by ICNA in its initial response, (Def.Mem.,

CASE 0:16-cv-00139-DWF-LIB Document 65 Filed 08/17/17 Page 33 of 44

PETCO Animal Supplies Stores, Inc. v. Insurance Co. of..., Not Reported in...

pp. 8–9), that the court ordered the attorney to sit for his deposition over his objection. There, Zurich sought a declaratory judgment that the *Miller–Shugart* settlement entered into by Canadian Pacific (its insured) and personal injury claimants was unreasonable and unenforceable against it. *Zurich Reinsurance,* 613 N.W.2d at 764–65. The district court granted summary judgment for the settling parties and Zurich appealed. In the excerpt of the Court of Appeals decision cited by ICNA, the court noted that:

> **\*13** The [claimants] did not claim punitive damages, and counsel for both the [claimants] and Canadian Pacific indicated that the settlement was based on compensatory damages and in no way included punitive damages. In his deposition, the [claimants] counsel said there was no discussion of punitive damages during the settlement discussions. When asked about the facts forming the basis of his opinion about punitive damages, he added: "That was not my conversation with the defendant. I never claimed punitive damages against the defendant. We did not settle this case based on punitive damages. We based the settlement on the basis of compensatory damages. But if the case was going to be tried, I certainly intended * * * to attempt to prove the case for punitive damages and make such a claim."

*Id.* at 764. Based on this brief excerpt, this Court cannot conclude, as ICNA did, that *Zurich Reinsurance* stands for the proposition that the court recognized an implied waiver of privileged and protected materials. As with the *Corn Plus* case, there is no discussion of waiver.

Likewise, the other cases cited by ICNA in its initial opposition do not support its "implied waiver" theory. *See* Def. Mem, pp. 8–9. In *Vetter v. Sobotnick,* 844 F.Supp. 1352, 1355 (D.Minn.1992), aff'd by *McNicholes v. Subotnik,* 12 F.3d 105 (8th Cir.1993), the court indicated that the plaintiff's lawyer informed him of the risks of going to trial. There is no indication that this statement fell within the definition of attorney-client privileged communication, and no discussion in the opinion regarding a waiver. In *Alton Johnson v. M.A.I. Co.,* 451 N.W.2d 651, 654 (Minn.Ct.App.1990), (*rev'd on other grounds,* 463 N.W.2d 277 (Minn.1990)), the court referenced an opinion of the insurer's counsel that the insurer was in a "precarious position" regarding coverage of a claim, but once again, there are no precedent facts from which this Court can conclude that this reference represented an implied waiver of privileged

communications. *S.G. v. St. Paul Fire & Marine,* 460 N.W.2d 639, 644 (Minn.Ct.App.1990) referenced an insured's attorney's advice to him regarding the size of typical jury awards in a negligent transmission of herpes case. Yet, there are no facts to support an implied waiver and the brief excerpt can as easily be interpreted to refer to the client's testimony about his lawyer's advice, not the lawyer's revelation of attorney-client privilege communications. In any event, under no circumstances does *St. Paul Fire & Marine* support ICNA's position.

In *Stan Koch & Sons Trucking, Inc. v. Great West Cas. Co.,* 517 F.3d 1032, 1036–38 (8th Cir.2008) attorney Ted Smetak recommended that his client Great West deny coverage for a wrongful death claim brought against a party that arguably had coverage for the accident under a Great West policy. Excerpts from Smetak's coverage analysis are reflected in the opinion. *Id.* at 1036. From this ICNA deduced that there was a waiver of attorney work product. Def. Mem., p. 9. The opinion indicates, however, that Great West itself provided Smetak's coverage analysis to its insured's risk manager. *Id.* at 1038. Again, there is no indication that the disclosure of Smetak's work product was involuntary, and no discussion of the issue of privilege or waiver. As with the other cases cited by ICNA, *Koch* does not support its proposition that the PETCO waived their attorney-client privilege and work product protections by entering into a *Miller–Shugart* settlement.

**\*14** At the motion hearing on PETCO and Ponce's motion to quash ICNA's subpoena, this Court requested additional briefing on whether parties waive attorney-client privilege and work product protections by entering into a *Miller–Shugart* settlement or by substituting counsel. PETCO responded that it could find no cases that supported either of these propositions. Plaintiffs' Supplemental Memorandum of Law in Support of the Motion to Quash the Subpoena ("Pl.Supp.Mem."), p. 1 [Docket No. 39]. However, it did point this Court to *Chomat v. Northern Ins. Co. of New York,* 919 So.2d 535 (Fl.Dist.Ct.App.2006), where the court rejected the insurer's attempt to depose counsel for the insured regarding the reasonableness and good faith of an agreement similar to a *Miller–Shugart* agreement (called a "Coblentz agreement").

Similarly, ICNA admitted that after conducting "exhaustive research" it could locate no case directly on point. Def. Supplemental Memorandum in Opposition

CASE 0:16-cv-00139-DWF-LIB   Document 65   Filed 08/17/17   Page 34 of 44

PETCO Animal Supplies Stores, Inc. v. Insurance Co. of..., Not Reported in...

to Motion to Quash Subpoena ("Def.Supp.Mem."), p. 6 [Docket No. 37]. However, after discussing the Eighth Circuit's three-factor analysis in *Pamida*, (*see* n. 5, *supra* ), ICNA directed the Court to four cases which ICNA characterized as addressing "settlements similar to *Miller–Shugart* agreements" and "all ordering disclosure of privileged information." *Id.* (citing *GAB Bus. Servs., Inc. v.. Syndicate*, 809 F.2d 755 (11th Cir.1987); *Hueske v. State Farm Fire & Cas. Co.,* 2007 WL 656298 (D.N.D., Feb. 27, 2007); *Waste Mgmt., Inc. v. Intl. Surplus Lines Ins. Co.,* 579 N.E.2d 322 (Ill.1991); *Lane v. Hartford Acc. & Indemn. Co.,* 1990 WL 255906 (Pa.Com.Pl., Feb. 7, 1990)). [7] After reviewing all of these cases, this Court finds the reasoning expressed in the cases cited by ICNA does not comport with the treatment of the attorney-client privilege, work product doctrine and the roles of insurers and their insureds, and ultimately, a *Miller–Shugart* settlement under Minnesota law.

For starters, ICNA's reliance on *Pamida* is misplaced. *Pamida* was an indemnification suit in which Pamida (a retailer) sought from a manufacture (Dynasty) reimbursement for attorney's fees and costs it had incurred for its defense of a patent infringement claim by an inventor. 281 F.3d at 728. The inventor sued Pamida alleging infringement of her patent for a shoe tying system. According to Dynasty, Pamida rebuffed an early settlement offer of $100,000 and instead embarked on a long and expensive course of litigation, which resulted in a settlement of $475,000 and attorney's fees of $750,000. *Id.* In the indemnification action, Pamida engaged the same lawyers from Larkin, Hoffman, Daly & Lindgren ("LHDL") who had represented it in the defense of the patent infringement case. Dynasty sought to depose the LHDL lawyers on whether the $750,000 in legal fees was reasonable, among other issues. *Id.* at 729. LHDL moved for a protective order, which was denied. *Id.* The Eighth Circuit affirmed the district court's decision, noting that:

> **\*15** Dynasty is primarily seeking information regarding the concluded patent infringement case, not the pending indemnification action. Furthermore, Dynasty is seeking to depose opposing counsel to discover information peculiarly within counsel's knowledge and centrally relevant to the issues in the indemnification action, i.e.,

whether the $750,000 in attorneys' fees incurred in defending the patent infringement action was reasonable and what action was taken to notify Dynasty of the patent infringement action and Pamida's claim for indemnification.

*Id.* at 731. Thus, by bringing the indemnification action for attorneys' fees and costs, Pamida directly put its attorneys' work into issue. *See id.* ("[h]ere, Pamida instituted this action by filing a lawsuit for indemnification seeking recovery for legal expenses thereby putting the work of its attorneys directly at issue in the case.") That is not the case here. The sum that Medtronic is seeking to recover from ICNA in the DJ action represents the valuation of the damages it suffered as a result of PETCO's alleged conduct, not attorneys' fees, and PETCO's attorney's fees are not at issue.

In *Lane,* an unpublished decision from a Dauphin County, Pennsylvania trial court, plaintiff and defendant stipulated to a $3 million dollar judgment, collectable only from defendant's insurer, Hartford. The judgment represented the limits of coverage under the insured-defendant's policy. *Lane,* 1990 WL 255906 at *2. The plaintiff sued to recover the judgment from Hartford and Hartford subpoenaed the defendant's attorney to obtain documents and information relating to the settlement, in which Hartford never participated. *Id.* The attorney resisted the subpoena and sought a protective order on the ground that it invaded attorney-client privilege and work product protected materials. *Id.* The trial court denied the attorney's motion for a protective order. *Id.* at *7.

Setting aside the fact that this trial court decision has no precedential effect on an issue that the Minnesota courts have never decided, it is important to note that even the *Lane* court was careful to limit its decision to the unique facts of that case: "[i]t would seem that at the very least under the facts of the case, i.e. the type of intangible injury [8], the relatively high figure, and its coinciding with the amount of coverage, an explanation is called for." *Lane,* 1990 WL 255906 at *6. More importantly, the underpinnings of the decision are not present here. For example, under Pennsylvania law apparently only communications by the client to the attorney are protected by the attorney-client privilege and not visa versa, clearly not the case under Minnesota jurisprudence. Further,

unlike the instant case, Hartford was excluded from the settlement negotiations and did not even learn of the settlement until after it was concluded. *Id.* at *2. Here, ICNA was placed on notice months before the settlement conference when PETCO and Medtronic were contemplating a *Miller–Shugart* agreement, and ICNA was present at the settlement conference and given the opportunity to participate in the settlement. [9]

**\*16** The *Heuske* decision, also cited favorably by ICNA, permitted written discovery on the terms of a confidential settlement between a plaintiff and a defendant, when a co-defendant and plaintiff had entered into a *Miller–Shugart* agreement. The court found that discovery on the confidential settlement, the terms of which were unknown to the insurer, which was potentially liable for payment under the *Miller–Shugart* settlement, was needed for the insurer to gauge the reasonableness of the *Miller–Shugart* settlement. *Heuske,* 2007 WL 656298 at * 3. Critical to the court's decision was the fact that the insurer had no access to information on the confidential settlement with the co-defendant and "[i]n some cases, evidence regarding the amount of a co-defendant settlement may be of assistance in evaluating the reasonableness of settlement with another defendant. *Id.* Those facts are not present here.

In *GAB Bus. Servs.,* [10] JDA Farms had an insurance policy on a racehorse. The horse had been insured for up to $250,000. 809 F.2d at 757. The horse was injured and ultimately died. *Id.* JDA Farms sued the insurer and the adjustor GAB, which was hired by insurer to evaluate the horse after it was injured. *Id.* GAB settled with JDA Farms for $15,000 and the insurer settled with JDA Farms for $250,000 which was the full amount of the insurance policy. *Id. at 757–58.* GAB sued the insurer for reimbursement of the $15,000 it had spent in settling with the JDA Farms; the insurer counterclaimed for the settlement expenses it had incurred to resolve the claim with JDA Farms. *Id.* at 758. In essence, the insurer's claim was that that GAB's negligence initiated a chain of events that caused its ultimate liability on the insurance policy. *Id.* at 759.

The case was tried to the jury, which rejected GAB's claim against the insurer, found GAB liable to the insurer, and awarded $200,000 in damages to the insurer.. *Id.* at 758–59. The insurer appealed claiming that it should have been awarded the full measure of its damages, which

included not only the $200,000 in attorney's fees it had expended in defending the claim by JDA Farms, but also "its settlement with JDA Farms and the expense of GAB's investigation." *Id.* at 759. In addition, the insurer challenged the lower court's decision to exclude expert testimony regarding the strength of JDA Farms' case as it bore on its decision to pay JDA Farms the full $250,000 policy limits in settlement. *Id.* For its part, GAB "complain[ed] that the trial court improperly allowed [the insurer] to cloak the substance of its settlement negotiations within the attorney-client privilege." *Id.*

The Eleventh Circuit affirmed the jury's decision as to GAB's claim against the insurer, but reversed the decision as to the insurer's counterclaim against GAB and remanded the case back to the trial court. In reaching its decision, the court determined that the district court erred in refusing to permit the questioning of the insurer's lawyers involved in settlement negotiations with JDA Farms concerning the substance of these negotiations and the motivation behind them, based on the attorney-client privilege. *Id.* at 762. The court concluded that the insurer had waived its attorney-client privilege when it "inject[ed] into this litigation an issue that require[d] testimony from its attorneys or testimony concerning the reasonableness of its attorneys' conduct." *Id.*

**\*17** In reaching its decision, the Eleventh Circuit explained that under Florida law "when the indemnitee has not given the indemnitor an opportunity to review, pass upon, or participate in the settlement," then the indemnitee must demonstrate "actual as opposed to potential liability." *Id.* at 760 (citations omitted). "If on the other hand GAB received adequate protection during the settlement negotiations, [the insurer] was required to show only potential liability. In either event [the insurer] could only recover so much of the settlement as it proved was reasonable in amount, (fn 10) and a consequence of GAB's breach of duty." *Id.* at 761. (citation omitted). [11]

In the footnote, the court stated:

Whether a settlement is reasonable depends upon "what a reasonably prudent person in the position of the defendant would have settled for on the merits of the plaintiff's claim." *Home Insurance Co. v. Advance Machine Co.,* 443 So.2d 165, 168 (Fla.Dist .Ct.App.1983) (quoting *Miller v. Shugart,* 316 N.W.2d 729, 735 (Minn.1982)). In determining

PETCO Animal Supplies Stores, Inc. v. Insurance Co. of..., Not Reported in...

CASE 0:16-cv-00139-DWF-LIB   Document 65   Filed 08/17/17   Page 36 of 44

whether a settlement is reasonable, a Florida court would consider not only such objective factors as the extent of damages, but also such subjective factors as the certainty of liability, the risks of going to trial and the chances that the jury verdict might exceed the settlement offer. *Id.* at 168–69.

Id. at 761. The court then stated:

> If [the insurer] introduces evidence as to the strength of JDA Farms' case-as [the insurer] must to prevail —it cannot hide behind the shield of privilege to prevent GAB from effectively challenging such evidence. [I]t is the rule in Florida that a party who bases a claim on matters which would be privileged, the proof of which will necessitate the introduction of privileged matter into evidence, and then attempts to raise the privilege so as to thwart discovery, may be deemed to have waived that privilege....

*Id.* (quoting *Home Insurance Co. v. Advance Machine Co.,* 443 So.2d 165, 168 (Fla.Dist.Ct.App.1983) (citing *Savino v. Luciano,* 92 So.2d 817, 819 (Fla.1957)). Interestingly, the Eleventh Circuit recognized that in *Home Insurance Co.,* the Florida court had found that the filing of a suit for contribution for a settlement, which requires by statute proof that the amount claimed "is not in excess of what was reasonable," (443 So.2d at 168 (quoting Florida Statutes § 768.31), does not waive the attorney-client privilege, having distinguished "such a case from those where the 'party seeking to avoid discovery has injected into litigation issues going to the very *heart* of the litigation.' " *Id.* n. 11 (quoting *Home Insurance Co.* 443 So.2d at 168 (emphasis in original) (citing *Hearn v. Rhay,* 68 F.R.D. 574 (E.D .Wash.1975); *Pitney–Bowes, Inc. v. Mestre,* 86 F.R.D. 444 (S.D.Fla .1980)). Nevertheless, relying on *Hearn* and *Pitney–Bowes,* the Eleventh Circuit concluded that the attorney-client privilege had been waived because "[t]he issues at the 'very heart' of this litigation are the liability, either actual or potential, of [the insurer], and the reasonableness of a $250,000 settlement, for a horse purchased for $7,500, which died from poisoning under suspicious circumstances." *Id.*

**\*18** This Court does not find the reasoning in *GAB* persuasive. First, it ignores the express holding in *Home Insurance Co.,* which concluded that a suit for contribution towards a settlement did not waive the attorney-client privilege, even though by statute the party seeking contribution had to establish the reasonableness of the settlement. Second, *Hearn* and *Pitney–Bowes,* upon which the Eleventh Circuit premised its reasoning to distinguish the *Home Insurance Co.* decision, *did* inject into the litigation issues that by their very nature required testimony of the party's attorneys.

In *Hearn,* the plaintiff, Hearn, was a prisoner who brought a § 1983 civil rights suit against prison officials regarding his confinement in the prison's mental health unit without a hearing or other review. 68 F.R.D. at 577. Hearn alleged that his confinement was punitive and not for the purpose of any legitimate mental health treatment. *Id.* The defendants asserted the affirmative defenses of good faith and qualified immunity. *Id.* Hearn contested those defenses and sought discovery of the legal advice provided to the defendants by the state attorney general. *Id.* It was Hearn's position that the prison superintendent "harbored ill feelings towards [him] and that [the superintendent] persisted in his allegedly illegal conduct ... after being put on notice by the attorney general that such conduct violated plaintiff's constitutional rights." *Id.* at 583. Hearn argued that to the extent the information sought was protected by attorney-client privilege, defendants waived the privilege by asserting the defenses of good faith and qualified immunity. *Id.*

The *Hearn* court analyzed the issue of waiver under the same three-part test described in *Pamida. Id.* at 582. Applying this framework, the court concluded that defendants had waived their attorney-client privilege because they: (1) asserted the affirmative defense of good faith; (2) through this affirmative act they placed the protected information at issue because the legal advice they received was relevant to their defense; and (3) maintaining the privilege would deprive Hearn of information he needed to contest defendants' defense. *Id.* at 581. Critical to the court's analysis was its determination that unlike the ordinary case, where "the obstruction is not likely to be great, for attorney-client communications are usually incidental to the lawsuit, notwithstanding their possible relevance, and other means of proof are normally available[,] ... [i]n this case, however, the content of defendant's communications with their

CASE 0:16-cv-00139-DWF-LIB Document 65 Filed 08/17/17 Page 37 of 44

PETCO Animal Supplies Stores, Inc. v. Insurance Co. of..., Not Reported in...

attorney is inextricably merged with the elements of plaintiff's case and defendants' affirmative defense. These communications are not incidental to the case; they inhere in the controversy itself, and to deny access to them would preclude the court from a fair and just determination of the issues." *Id.* at 582. Most importantly, the court stated that a "substantial showing of merit to plaintiff's case must be made" before a court could entertain the disclosure of attorney-client protected information. *Id.* at 582.

> **\*19** The competing interest of protecting the constitutional rights of prison inmates and protecting institutional personnel from harassment are best accommodated by allowing discovery of legal advice only within the narrow confines outlined above, subject to the requirement that plaintiff affirmatively demonstrate the merit of his case before a court will order the defendant state official to lay bare his legal files.

*Id.* The court then found that Hearn had met this requirement by submitting affidavits and "numerous depositions of reliable persons" who stated under oath that the prison superintendent was hostile to Hearn and persisted in his conduct toward Hearn even after the state attorney general notified the superintendent that his conduct violated Hearn's constitutional rights. *Id.*

The court concluded:

> [t]hese affidavits and depositions also corroborate the allegations in the complaint that the conditions of plaintiff's confinement were deplorable and that plaintiff was accorded no due process. * * * Although the court does not accept these allegations as true, it must consider them in a light favorable to plaintiff at the discovery stage. * * * Under these circumstances, the court is satisfied that the need for confidentiality must give way to the plaintiff's need to have access to his proof. However the court does not reach this conclusion lightly.

*Id.* at 583.

None of the facts before the court in *Hearn* are present here. The nature of the claims and defenses in the DJ action have not put Ponce's advice to PETCO on liability, damages and settlement at issue, nor are they so "inextricably merged" with the elements to be proven to establish coverage and enforceability of the *Miller–Shugart* Agreement. Moreover, there has been no showing, much less a "substantial showing," on the merits of ICNA's defense to the DJ action so as warrant treading on the attorney-client privilege and requiring counsel to "lay bare his legal files."

In *Pitney–Bowes,* Pitney-Bowes sued a defendant in a declaratory judgment action, seeking a declaration of its rights under certain patent licensing agreements with the defendant. 86 F.R.D. at 445. Pitney–Bowes sought a declaration that the contracts at issue had expired and that it was no longer obligated to pay royalties to the defendant; the defendant countered that the agreements had not expired and that, at any rate, the agreements were not limited to patent rights, but encompassed other issues. *Id.* Pitney-Bowes' lawsuit asserted that "it had intended to enter into modification of pure patent licensing agreements" with the defendant, but then sought to "withhold communications between its attorneys and executives that might reveal the true intent behind the agreements." Relying on *Hearn,* and applying the same three-part test of waiver, the *Pitney–Bowes* court concluded that Pitney–Bowes had waived attorney client privilege because it "injected a narrow issue into the dispute, namely, the intent of the parties.... P–B has placed in issue the very soul of this litigation the intent of the parties with regard to construction of certain terms of the Agreements." *Id.* at 447.

**\*20** Here, the issues of the reasonableness of the settlement, or whether it was obtained by collusion or fraud, do not place at issue "the very soul of this litigation." In short, the proof of these claims (*e.g.* customary evidence on liability and damages, expert opinion of trial lawyers evaluating this "customary" evidence; verdicts in comparable cases; the likelihood of favorable or unfavorable rulings on legal defenses and evidentiary issues; the judge's own personal experience with jury awards in similar areas if the tort action had been tried), does not implicate evidence encompassed in

the contents of Ponce's communications to PETCO or his work product on the case.

ICNA also cited *Waste Mgmt., Inc. v. International Surplus Lines Ins. Co,* 579 N.E.2d 322, 327 (Ill.1991) for the proposition that when parties enter into a *Miller–Shugart* settlement, they waive the attorney-client privilege and work product protection by placing the protected information "at issue." Def. Supp. Mem., p. 6.; Def. Supp. Reply Mem., p. 6 [Docket No. 41]. In that case, the insureds were defendants in two lawsuits involving claims against them for hazardous waste disposal sites (the "Nunn litigation" and the "Miller litigation"). *Id.* at 325. The Nunn litigation was tried whereas the insureds retained counsel, defended and settled the Miller litigation. *Id.* The insureds then sought indemnification under their policy from the insurer for the Miller litigation for defense and settlement costs and the insurers denied coverage. *Id.* During discovery, the insurer sought access to defense counsel's files in the Nunn and Miller litigations, which the insureds resisted on the ground of privilege. *Id.*

The Illinois Supreme Court determined that the attorney-client privilege had no application in the circumstances of the case. First, the court held that the files were "at issue" because "it is the very conduct of defense counsel in the underlying litigation which is the basis of insurers' declaratory judgment action and its defense to insureds' declaratory judgment action." *Id.* at 327. Second, the court determined that the "duty to cooperate" clause in the insureds' contract with the insurer, "imposed upon the insureds the duty to assist insurers in the conduct of suits and in enforcing any right to contribution or indemnity against persons potentially liable to insureds," even if the parties were now adverse to each other. *Id.* at 328. The court reasoned: "In light of the plain language of the cooperation clause in particular, and language in the policy as a whole, it cannot seriously be contended that insureds would not be required to disclose contents of any communications they had with defense counsel representing them on a claim for which insurers had the ultimate duty to satisfy." *Id.*

Third, the court relied on the "common interest doctrine," under which the defense attorney was deemed to be working for the insurer and insured's "common interest," again even when this attorney was "neither retained by nor

in direct communication with the insurer." *Id.* (citations omitted).

**\*21** This Court rejects the holding in *Waste Mgmt.* where the underpinnings of the decision is completely at odds with the facts in this case and the law in Minnesota bearing on the relationship between insureds and their insurers. [12] As explained in more detail in the discussion regarding *Chomat* and *Metropolitan Life Ins. Co.* below, "the very conduct of [Ponce] in the underlying litigation" is not at issue in determining the enforceability of the *Miller–Shugart* settlement, and neither the cooperation clause (which was not put into evidence by either ICNA or PETCO) nor the common interest doctrine can have application when the carrier has denied coverage. Indeed in Minnesota, the insured is treated as the sole client of the defense attorney hired by the insurer and the attorney owes allegiance to the insured, not to the insurance company that hired the attorney. *Pine Island Farmers Coop v. Erstad & Riemer, P.A.,* 649 N.W.2d 444, 449 (Minn.2002) (defense counsel hired by insurer to defend a claim against insureds represents the insureds, "defense counsel owes a duty of undivided loyalty to the insured and must faithfully represent the insureds interests."); *see also Crum v. Anchor Cas. Co.,* 264 Minn. 378, 391–92, 119 N.W.2d 703, 712 (1963) ("[a]n attorney retained by an insurer to defend its insured, as long as he represents the insured, is under the same obligations of fidelity and good faith as if the insured had retained the attorney personally.")

In *Chomat,* plaintiffs sued a company and their officers for severe injuries. *Id.* at 536. The insurance company denied coverage and the defendants commenced a declaratory judgment action against the insurer and their insurance agent. *Id.* The defendants settled and entered into a "*Coblentz* agreement," [13] in which defendants assigned their claim for coverage against the insurer and agent to the plaintiffs, and the plaintiffs were substituted as plaintiffs in the declaratory judgment action. *Id.* at 536–37. After coverage was granted, the insurer attempted to depose the settling plaintiffs' lawyer on the reasonableness and good faith of the *Coblentz* agreement. Like a *Miller–Shugart* agreement, "under a *Coblentz* agreement, 'the injured party must bring an action against the insurer and prove coverage, wrongful refusal to defend, and that the settlement was reasonable and made in good faith.' " *Id.* (quotation and citations omitted).

CASE 0:16-cv-00139-DWF-LIB Document 65 Filed 08/17/17 Page 39 of 44

PETCO Animal Supplies Stores, Inc. v. Insurance Co. of..., Not Reported in...

As an initial matter, the parties and court agreed that "plaintiffs' filing of the action against the insurer and initial burden of going forward [14] did not, without more, create a waiver of the attorney-client privilege." *Id.* at 537–36 (citations omitted). Nevertheless, the insurer argued that since plaintiffs had the initial burden of going forward on the issues of reasonableness and good faith, these issues had been injected by the plaintiffs into the suit and consequently, the attorney-client privilege was waived. *Id.* at 538. The court rejected the insurer's claims stating:

**\*22** The determination of whether a settlement is reasonable is made by a "reasonable person" standard. If counsel's advice were required to be disclosed, it would still not be binding on the insurance company. Instead, proof of reasonableness is ordinarily established through use of expert witnesses to testify about such matters as the extent of the defendant's liability, the reasonableness of the damages amount in comparison with compensatory awards in other cases, and the expense which would have been required for the settling defendants to defend the lawsuit.

\* \* \*

In addition to making a prima facie showing of reasonableness, the plaintiffs must also make a prima facie showing of good faith. Here, too, making a prima facie case does not implicate privileged information. Without attempting a comprehensive definition, we think a bad faith claim includes a false claim, or collusion in which the plaintiffs agree to share the recovery with the insured. These matters involve the underlying facts of the case and do not involve the injection of privileged matters.

*Id.* (footnote omitted).

In *Metropolitan Life Ins. Co. v. Aetna Cas. & Sur. Co., 730 A .2d 51, 64 (Conn.1999)* the insured brought an action against excess liability insurer to recover cost of settling asbestos tort cases after the insurer refused to defend the insured. The trial court ordered the insured to disclose documents containing communications with attorneys concerning settlement of the tort cases. The Connecticut Supreme Court reversed, finding that neither the "at issue" exception, the cooperation clauses in the insurance contract or the common interest doctrine required disclosure.

The court concluded the insured had not placed any information or advice contained in the privileged documents at issue based on the following analysis (which this Court quotes at length because of its sound reasoning):

Because of the important public policy considerations that necessitated the creation of the attorney-client privilege, the "at issue," or implied waiver, exception is invoked only when the contents of the legal advice is integral to the outcome of the legal claims of the action. Such is the case when a party specifically pleads reliance on an attorney's advice as an element of a claim or defense, voluntarily testifies regarding portions of the attorney-client communication, or specifically places at issue, in some other manner, the attorney-client relationship. In those instances the party has waived the right to confidentiality by placing the content of the attorney's advice directly at issue because the issue cannot be determined without an examination of that advice. If the information is actually required for a truthful resolution of the issue on which the party has raised ... the party must either waive the attorney-client privilege as to that information or it should be prevented from using the privileged information to establish the elements of the case.

\* \* \*

**\*23** Merely because the communications are relevant does not place them at issue. If admitting that one relied on legal advice in making a legal decision put the communications relating to the advice at issue, such advice would be at issue whenever the legal decision was litigated. If that were true, the at issue doctrine would severely erode the attorney-client privilege and undermine the public policy considerations upon which it is based.

\* \* \*

Where, as in the present case, an insured alleges that an insurer improperly has failed to defend and provide coverage for underlying claims that the insured has settled the insured has the burden of proving that the claims were within the policy's coverage and that the settlements were reasonable. The reasonableness of the settlement, in turn, should be examined under an objective standard. Reasonableness is determined

CASE 0:16-cv-00139-DWF-LIB   Document 65   Filed 08/17/17   Page 40 of 44

PETCO Animal Supplies Stores, Inc. v. Insurance Co. of..., Not Reported in...

according to factors such as, but not limited to, "whether there is a significant prospect of an adverse judgment, whether settlement is generally advisable, [whether] the action is taken in good faith, and [whether it is] not excessive in amount...." J. Stempel, Law of Insurance Contract Disputes (2d Ed.1999) § 9.02[b], pp. 9–50 through 9–51.

\* \* \*

It would be quite different if the plaintiff sought to prove reasonableness based upon the advice of counsel. In that instance, counsel's advice would be at issue—but that is not the situation in the present case. Accordingly, although the reasonableness of the settlements is directly at issue, the exact communications between the plaintiff and its attorneys regarding the decision to settle, which would aid only in a subjective determination, are not at issue. In sum, the defendants in the present case can assess whether the settlements of the asbestos tort actions were reasonable by examining the facts of the asbestos tort actions—the same material that the plaintiff had available to it when making its decision—and by consulting experts, just as the plaintiff had the opportunity to do.

*Id.* at 52–56 (quotations, footnotes and citations omitted).

As for the insurer's reliance on the cooperation clause to support its motion for disclosure of attorney-client privileged communications, the court held that "disclosure pursuant to the cooperation clauses possibly could be required only if and when the insurance company participates 'in the defense' of underlying cases. In the present case, the cooperation clauses cannot justify disclosure because the defendants have failed to fulfill this predicate[,]" and particularly, where they have denied coverage. *Id.* at 58–59.

Finally, the court found there could be no common interest in defeating or minimizing claims against the insured where the insurer has refused to cover the insured's claims. *Id.* at 61. "Furthermore, in a case such as the present one, where the insured retained its own attorneys and acted independently of its insurers in settling the underlying cases, the insured and insurer have even less commonality of interests. In either scenario, they do not share common interests in the characterization of the claims or in the settlement of such claims. \* \* \* Moreover, an insured's and insurer's interests immediately

become conflicted as soon as the insurer declines to cover the claims. Thus, many courts have rejected the theory proposed by the defendants." *Id.* at 61–62 (footnote and citations omitted).

**\*24** After reviewing the cases cited by both parties and the test of enforceability of a *Miller–Shugart* settlement—reasonableness and lack of fraud or collusion—this Court finds, as did the courts in *Chomat* and *Metropolitan Life Ins. Co.,* that there has been no waiver by PETCO of the attorney-client privilege with respect to the communications between PETCO and Ponce or the work product prepared by Ponce on PETCO's behalf. First, the simple act of entering into a *Miller–Shugart* agreement does not result in a waiver because there is no evidence before this Court to suggest that PETCO intends to rely on advice of its counsel to establish the reasonableness of the settlement. The test for reasonableness of a *Miller–Shugart* settlement is objective. *See Miller v. Shugart,* 316 N.W.2d at 735. Under this objective standard, Ponce's subjective beliefs or opinions about the settlement are irrelevant. As PETCO pointed out, implied waiver occurs "when the insured affirmatively places privileged information at issue or when a party actually disclosed the privileged information." Plaintiffs' Reply Memorandum of Law in Support of the Motion to Quash the Subpoena ("Pl. Reply Mem.") [Docket No. 42], p. 3. Here, PETCO (and now Medtronic as PETCO's assignee) has represented that it does not need privileged material to demonstrate the reasonableness of the settlement agreement. Pl. Supp. Mem., p. 5; Pl. Reply Mem., p. 3 ("[T]here will be no affirmative act on the part of PETCO and IPSD that places privileged material 'at issue.' PETCO and IPSD will use non-privileged material to meet its burden. Namely, expert affidavits and affidavits from PETCO and IPSD."). Under these circumstances, where PETCO does not intend to rely on the advice and evaluations performed by Ponce and his firm to establish the reasonableness of the settlement it reached with Medtronic, there can be no waiver.

Second, neither the agreement of PETCO to cooperate with Medtronic in the DJ action nor the substitution of Medtronic's counsel in that suit, can be construed as a waiver. PETCO has assigned its coverage claim to Medtronic and Medtronic has chosen to substitute its attorneys for PETCO's lawyers. Medtronic and its lawyers now stand in the shoes of PETCO. In short, while previously the parties had been adverse, at this juncture,

CASE 0:16-cv-00139-DWF-LIB  Document 65  Filed 08/17/17  Page 41 of 44

PETCO Animal Supplies Stores, Inc. v. Insurance Co..., Not Reported in...

their interests are "entirely aligned" and they share a common interest of seeing that Medtronic collects its judgment against ICNA. *See Sandoval v. American Bldg. Maint. Indus., Inc.* 267 F.R.D. 257, 273 (D.Minn.2007) ("[p]ersons who consult an attorney together do not necessarily waive the attorney-client privilege, providing there is a common interest shared by persons with respect to the subject matter of the communications * * *the common interest "may be 'either legal, factual or strategic in character.") (citing *In re Grand Jury Subpoena Duces Tecum,* 112 F.3d 910, 922 (8th Cir.1997 and quoting Restatement of Evidence § 126(1), cmt.e). [15] Thus, the fact that counsel for PETCO and Medtronic may now have access to privileged communications and work product of the other does not amount to a waiver of their communications and work product such that their opponent, ICNA, is entitled to the information. It only means that by now joining forces to seek coverage from ICNA that PETCO and Medtronic have waived whatever privileges they may have possessed as to each other, and both will still be obligated to keep confidential what they have learned from this alliance. *See Metropolitan Life Ins. Co.,* 730 A.2d at 65–66 ("[D]efendants' assertion that because the plaintiff gave Travelers access to certain privileged documents that are at issue in the present case, it has waived its privilege vis-a-vis the defendant excess liability insurers, is without merit.... [A]ny such disclosures made to Travelers pursuant to defending the asbestos tort actions only waived privileges as to Travelers, who now has an obligation to keep those disclosures confidential.").

**\*25** As to the assessment of fraud or collusion, ICNA noted that in some cases, a *Miller–Shugart* settlement that attempts to shift risk of liability for payment from one insurer to another may be collusive as a matter of law. Defendant's Second Supplemental Responsive Memorandum of Law, p. 5 [Docket No. 41]. ICNA also argued that PETOCO's hiring of Medtronic's former attorneys to prosecute the coverage action, may be also evidence of collusion. *Id.* Whether the evidence will lead to these statements being deemed "true" is not yet known. Nevertheless, these possible "truisms" do not lead this Court to conclude that PETCO has waived its right to assert the attorney-client privilege or the protections of the work product doctrine. Where PETCO does not intend to rely on the advice and work product Ponce performed in the Medtronic action in order to show that the settlement was not based on collusion or fraud, then if ICNA intends to prove otherwise, it will not be able to do

it by examining PETCO's attorneys. In short, ICNA is not entitled Ponce's testimony or the documents sought by the subpoena to establish the facts underlying the invalidity of the settlement.

Finally, ICNA's suggestion that there would be no waiver if:

> (1) PETCO "elected to continue to prosecute the declaratory judgment action either with its existing counsel, or new, unaffiliated counsel;" or (2) had Medtronic "been substituted for, and in place of, PETCO as the proper plaintiff to prosecute the declaratory judgment action either with its existing counsel, or new, unaffiliated counsel;" or (3) had Medtronic "intervened into the declaratory judgment action, and both Medtronic and PETCO could have continued to prosecute the declaratory judgment action together, but with separate, unaffiliated counsel—either existing or new,"

are distinctions without a difference. *See* Def. Supp. Reply Mem., pp. 6–7. Having made the decision to deny coverage to PETCO (which then led PETCO to sue ICNA), ICNA, as an adverse party to PETCO, had no rights during the pendency of the Medtronic action to discover the privileged communications between PETCO and its retained counsel or that counsel's work product, and the settlement by PETCO of the Medtronic action without the participation of ICNA does not change that result. Stated otherwise, the situation here is no different than a scenario where PETCO simply settled with Medtronic, and then continued on with its coverage action seeking reimbursement for the settlement. Surely, ICNA, as PETCO's opponent, would not claim that it was entitled to delve into the communications and work product of its adversary's counsel to determine whether the settlement reached by PETCO was reasonable. The *Miller–Shugart* settlement, assignment of the coverage claim to Medtronic, substitution of counsel, and cooperation between Medtronic and PETCO does not lead to a different outcome.

The Court's inquiry does not end with its analysis of waiver, however. Pursuant to Fed.R.Civ.P. 26(b)(3): "[o]rdinarily, a party may not discover [work product] documents" unless the party seeking the discovery "shows that it has a substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed.R.Civ.P.

CASE 0:16-cv-00139-DWF-LIB  Document 65  Filed 08/17/17  Page 42 of 44

PETCO Animal Supplies Stores, Inc. v. Insurance Co. of..., Not Reported in...

26(b)(3)(A)(ii). If the party seeking such discovery makes such a showing, the court may order the materials produced, but must "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed.R.Civ.P. 26(b)(3)(B). ICNA argued that the communications, opinions or advice Ponce exchanged with his client or its direct insurers cannot reasonably be discovered in any other way except through the subpoena. Def. Mem., pp. 6, 12. This is true, but irrelevant. Rule 26 carves out an exception for attorney work product, which courts must be particularly careful to guard. Therefore, while ICNA may want communications, opinions or advice Ponce exchanged with his client or its direct insurer, it is exactly that kind of work product that ICNA is not entitled to have. Cf. Metropolitan Life Ins. Co., 730 A.2d at 56 ("The trial court in the present case seems to have misconstrued the at issue exception by focusing on the defendants' need for the documents. When privileged communications are not at issue, the opposing party cannot destroy the attorney-client privilege by merely claiming a need for the documents. It would be inconsistent with the nature and purpose of the [attorney-client] privilege to make an exception to the privilege based only on the unavailability of information from other sources.") (footnotes, internal quotations and citations omitted).

### D. *Non–Privileged Documents*

**\*26** Although the Court has concluded that there has been no waiver of attorney-client privilege or the work-product protection, it is also true that ICNA's subpoena seeks documents that do not appear to this Court to be privileged or protected, such as statements, pleadings, correspondence between lawyers (presuming that ICNA is seeking correspondence between opposing counsel), and demands. ICNA also sought to have Ponce produce documents regarding any individual "whom you plan to call as an expert witness at trial, whom you have consulted in anticipation of litigation or preparation for trial, or who has provided an evaluation of this matter in the Medtronic action." [16]

Ponce argued that the statements, pleadings, discovery and expert information sought were available elsewhere and he should not be forced to produce them. Pl. Mem., p. 7. This Court agrees. These records are readily and equally accessible to ICNA through the public record or

discovery directed to PETCO and Medtronic. There is no basis for shifting the burden and expense of searching and printing ECF records on to Ponce, a non-party. See Fed.R.Civ.P. 45(c)(3)(A)(iv) (the Court must quash a subpoena that subjects a person to undue burden); *United States v. Columbia Broad. Sys., Inc.,* 666 F.2d 364, 371 (9th Cir.1982) ("Although party witnesses must generally bear the burden of discovery costs, the rationale for the general rule is inapplicable where the discovery demands are made on non-parties. Nonparty witnesses are powerless to control the scope of litigation and discovery and should not be forced to subsidize an unreasonable share of the costs of a litigation to which they are not a party."); *Cusumano v. Microsoft Corp.,* 162 F.3d 708, 717 (1st Cir.1998) ("[Nonparties] have no dog in [the] fight. * * * Accordingly, concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs.")

Similarly, there is no reason that ICNA cannot seek discovery from PETCO on its relationship with its other insurer, and discovery directed to Medtronic and PETCO regarding any settlement discussions, negotiations, offers, and demands that occurred between those two parties during the Medtronic action, and any evaluations that were provided from one party to the other. [17]

As to that portion of the subpoena that seeks documents regarding experts "you" plan to call at trial or consulted in anticipation of litigation or preparation for trial, the request makes no sense when directed to Ponce. Ponce is not counsel for PETCO in this DJ action and is not calling witnesses for trial on PETCO's behalf. That portion of ICNA's subpoena is also quashed.

Finally, to the extent that ICNA is requesting documents regarding any experts who provided an evaluation in the Medtronic action, including "the individual's curriculum vitae, the individual's report, opinions, findings, or evaluation, and any photographs, tests, results or other bases used, considered or relied upon by the individual in rendering such a report, opinion, finding or evaluation," this Court find that this request should be directed to PETCO, which can then determine whether it is relevant to the DJ action and whether it is willing to disclose its consulting experts opinions.

### IV. CONCLUSION

**\*27** For all of the foregoing reasons, the PETCO plaintiffs' and Ponce's motion to quash ICNA's subpoena is granted.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2490298

Footnotes

1 IPSD is a wholly owned subsidiary of PETCO. Amended Complaint, ¶ 14, Civ. No. 10–682 [Docket No. 14].

2 Neither party provided the Court with a copy of the executed *Miller–Shugart* Agreement. However, ICNA submitted a copy of the proposed *Miller–Shugart* Agreement and Stipulation and Miller–Shugart Assignment. *See* Butler Aff., Ex. 1. PETCO has not disputed that the draft submitted is, in fact, the *Millar–Shugart* Agreement and Assignment at issue. Therefore, in the absence of any conflicting information, this Court has relied on the *Miller–Shugart* Agreement submitted by ICNA.

3 Paragraph 13 refers to $236,762.78, but based on Paragraph 14, the Court believes that may be an error and the parties meant to state $286,762.78.

4 Minn.Stat. § 595.02(b) provides: "An attorney cannot, without the consent of the attorney's client, be examined as to any communication made by the client to the attorney or the attorney's advice given thereon in the course of professional duty; nor can any employee of the attorney be examined as to the communication or advice, without the client's consent."

5 The Court notes that ICNA relies extensively on the three-factor test enunciated by the Eighth Circuit in *Pamida* to determine whether there has been a waiver of the attorney-client privilege. *See Pamida,* 281 F.3d at 731 ("Under Nebraska law, an implied waiver of the attorney-client privilege occurs when "(1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.") (quoting *League v. Vanice,* 221 Neb. 34, 374 N.W.2d 849, 856 (Ne.1985) (citations omitted)). However, as evident by the quote, recognizing that state law supplies the rule of decision on privilege in diversity cases, the court applied Nebraska law. While Minnesota's articulation of waiver is not substantially different than Nebraska's, this three-factor test has not been adopted in Minnesota.

6 Corn Plus and Lumbermens intervened in the CNA state declaratory judgment action, Wanzek was dismissed, the parties were realigned so that Corn Plus became the plaintiff and CNA and Lumbermens became defendants, and the declaratory judgment action was removed to federal court. [Corn Plus Docket No. 187] (Order Oct. 5, 2006 at p. 2).

7 At the same time, ICNA acknowledged six other cases that did not find waiver of privilege. Def. Supp. Mem., p. 6 (citing *Allstate Ins. Co. v. Levesque,* 263 F.R.D. 663 (M.D.Fla.2010); *Ekeh v. Hartford Fire Ins. Co.,* 39 F.Supp.2d 1216 (N.D.Cal.1999); *Metropolitan Life Ins. Co. v. Aetna Cas & Sur. Co.,* 730 A.2d 51 (Conn.1999); *Chomat v. Northern Ins. Co. of New York,* 919 So.2d 535 (Fla.Dist.Ct.App.2006); *Lee v. Progressive Express Ins. Co.,* 909 So.2d 475 (Fla.Dist.Ct.App.2005); *Home Ins. Co. v. Advance Machine Co.,* 443 So.2d 165 (Fla.Dist.Ct.App.1983).

8 Plaintiffs claimed they were injured by defendant-employer's use of "psychodynamic supervision training," which was "primarily sexually oriented." *Lane,* 1990 WL 255906 at *1.

9 The *Lane* decision has not been relied upon or cited by any court outside of Pennsylvania.

10 *GAB Bus. Servs.* has only been cited positively once since its publication.

11 The court noted that whether the insurer had to prove actual or potential liability to JDA Farms, expert testimony and other evidence relating to the strength of JDA Farms' claim "was not only relevant, but absolutely essential." *Id.* at 761–62. However, at trial, the insurer introduced no evidence to establish "why it settled and whether the settlement was reasonable, ... due in part to an erroneous ruling that such evidence was inadmissible." *Id.* at 762. The court stated that this was a basis for remand. *Id.*

12 The *Waste Mgmt.* holding, that a cooperation clause in an insurance contract destroys all expectation of attorney-client privilege, has been soundly rejected by courts across the country. *See Bituminous Cas. Corp. v. Tonka Corp.,* 140 F.R.D. 381, 386–87 (D.Minn.1992) ("This court finds the reasoning of the Illinois Supreme Court [in *Waste Management]* to be fundamentally unsound. This court rejects the conclusion that because an insured agrees to cooperate with the insurance company, in the event he is sued or otherwise makes a claim under the policy, that the insured has thereby forever contractually waived the attorney-client privilege."); *Eastern Air Lines, Inc. v. United States Aviation Underwriters, Inc.,* 716 So.2d 340, 342–43 (DCA3rd Fla.1998) ("we reject the rule announced by the Illinois Supreme Court in *Waste Management* " and collecting cases from other jurisdictions that have rejected the *Waste Management* rule, including California, Delaware, Minnesota, New Jersey, Ohio and Pennsylvania); *Rockwell Int'l Corp. v. Superior*

*Court,* 26 Cal.App.4th 1255, 1262–63 (Cal.Ct.App.1994) ("[w]e are not the first court to refuse to adopt the views expressed in *Waste Management* "); *Remington Arms Co. v. Liberty Mut. Ins. Co.,* 142 F.R.D. 408, 416–17 (D.Del.1992) (explicitly rejecting *Waste Management* ); *North River Ins. Co. v. Philadelphia Reinsurance Corp.,* 797 F.Supp. 363, 369 (D.N.J.1992) ("[t]his Court ... rejects the reasoning of *Waste Management.*").

Similarly, the Court notes that the sister court in this district rejected the "common interest" exception as a basis for requiring disclosure of attorney-client privileged documents. *See Bituminous Cas. Corp.,* 140 F.R.D. at 386–87. ("This court also finds unsound the Illinois Supreme Court's extension of the "common interest" exception to the attorney-client privilege. When an attorney acts for two different clients who each have a common interest, communications of either party to the attorney are not necessarily privileged in subsequent litigation between the two clients. The *Waste Management* opinion extends this doctrine to hold the attorney-client privilege unavailable to an insured even where the insured's attorney never represented the insurance company, and was not even retained by the insurance company to represent the insured. This reasoning is unsound. The rationale which supports the 'common interest' ' exception to the attorney-client privilege simply doesn't apply if the attorney never represented the party seeking the allegedly privileged materials.") (citation omitted).

13   *Coblentz v. American Surety Co. of New York,* 416 F.2d 1059 (5th Cir.1969).

14   With a *Coblentz* agreement, the claimant must "assume the burden of initially going forward with the production of evidence sufficient to make a prima facie showing of reasonableness and lack of bad faith, even though the ultimate burden of proof will rest upon the carrier." *Chomat,* 919 So.2d at 537 (quotation and citations omitted).

15   "The common interest privilege is not an independent basis for privilege, but an exception to the general rule that the attorney-client privilege is waived when privileged information is disclosed to a third party." Edna S. Epstein, *The Attorney–Client Privilege and the Work–Product Doctrine,* 196 (American Bar Association Section of Litigation, 4th ed.2001). The common interest privilege assumes "there is a valid basis for exchanging information with a third party without undermining the requirement of confidentiality for the attorney-client privilege to apply." *Id.* "In effect, it states that privileged communications shared among and within some group of people will be deemed to have been made in confidence." *Id.* According to Epstein, there are three situations where this exception is deemed to apply. *Id.* at 200–206. The first being a single attorney representing multiple clients in the same matter (*id.* at 200–201); the second is when multiple parties with separate attorneys share a common defense (*id.*); and the third situation arise "when two or more clients share a common legal or commercial interest and, therefore, share legal advice with respect to that common interest." *Id.* at 203. "The common interest doctrine encourages parties working with a common purpose to benefit from the guidance of counsel, and thus avoid pitfalls that otherwise might impair their progress toward their shared objective." *Id.*

16   In its Supplemental Reply, ICNA urged:

At a bare minimum, this Court should find that privilege has been waived, and to allow INA to explore through deposition testimony and discovery, as to three specific areas of inquiry: 1) the relationship between PETCO and its other insurer(s), in light of the precedent recognizing that an attempt to shift the risk from one insurer to another is collusive as a matter of law; 2) any settlement discussions, negotiations, offers, demands, or evaluations that occurred on behalf of Medtronic or PETCO, since Minnesota courts have routinely recognized the importance of such evidence on a finding of reasonableness; and 3) all billing records and other evidence supporting the amount of fees allegedly incurred in the defense of the underlying litigation, which PETCO is seeking to recover from INA in this matter.

Def. Supp. Reply, p. 12 n. 1.

17   As for ICNA's request that Ponce be ordered to produce "all billing records and other evidence supporting the amount of fees allegedly incurred in the defense of the underlying litigation, which PETCO is seeking to recover from INA in this matter," (Def. Supp. Reply, p. 12 n. 1), ICNA did not ask for billing records in its subpoena. Thus, that issue is not properly before the Court.

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.